Matthew G. Monforton, Montana Bar # 5245
Monforton Law Offices, PLLC
32 Kelly Court
Bozeman, Montana 59718
Telephone: (406) 570-2949
Email: matthewmonforton@yahoo.com

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT
## DISTRICT OF MONTANA
## HELENA DIVISION

| | |
|---|---|
| ACCOUNTABILITY IN STATE GOVERNMENT, a Montana independent political committee; DAN BARTEL, <br><br> Plaintiffs, <br><br> vs. <br><br> AUSTIN KNUDSEN, in his official capacity as Montana Attorney General; KEVIN DOWNS, in his official capacity as Lewis and Clark County Attorney; CHRIS GALLUS, in his official capacity as Montana Commissioner of Political Practices, <br><br> Defendants. | Cause No. <u>CV-26-38-H-SPW</u> <br><br> **COMPLAINT** |

## INTRODUCTION

1. Plaintiff Dan Bartel is a former legislator who is currently under state investigation – and faces imminent civil and criminal prosecution – for doing what the First Amendment expressly protects: producing campaign mailers to inform voters about how their legislators spent taxpayer money. The mailers are core

political speech and include authentic photographs of legislators describing the positions they took on various legislation in both words and images. The images were AI-generated and included a gas pump, a pride flag, and preferred-pronoun button that reflected the legislators' positions and illustrate, vividly and unmistakably, the ideological character of the legislation they supported.

2.      Some Legislators took offense at images on the mailers that they claim were created using AI or digital technology purportedly regulated by Montana's new law. So far, three legislators have filed campaign complaints under a new Montana statute that patently violates the First Amendment and includes penalties of civil fines and potential prosecution with up to two years in state prison.

3.      That statute, Mont. Code Ann. § 13-35-801, *et seq*., which Plaintiffs refer to herein as the Digital Censorship Act (the "Act"), was enacted in 2025. It is not an aberration but rather the latest in a long line of Montana laws struck down by the Ninth Circuit and this Court after being used against citizens who dared to criticize their legislators' voting records. This Court recently reminded Montana's Legislature that "the First Amendment requires that politicians tolerate insulting, even outrageous, speech in order to provide adequate breathing space to the

freedoms protected by the First Amendment." *Montana Citizens for Right to Work v. Mangan*, 580 F. Supp. 3d 911, 924 (D. Mont. 2022).[1]

4.    Ignoring this Court's warning, the Montana Legislature, yet again, criminalized protected political speech. The Digital Censorship Act purports to restrict so-called AI-generated content in campaign communications during the 60-day window before an election — precisely the period when political speech is most vital and most constitutionally protected.

5.    Federal courts have already struck down other statutes regulating AI-generated speech in California and Hawaii. *See Kohls v. Bonta*, 797 F. Supp. 3d 1177, 1189 (E.D. Cal. 2025), *appeal docketed*, No. 25-6138 (9th Cir. Sept. 19, 2025); *The Babylon Bee, LLC v. Lopez*, 2026 WL 555552, at *1 (D. Haw. Jan. 30, 2026).

---

[1] *See, e.g., Mangan*, 580 F. Supp. 3d at 923-24 (striking down statute requiring political committees to provide contemporaneous disclosure to candidates of negative advertising); *Butcher v. Knudsen*, 34 F.4th 1163, 1165-66 (9th Cir. 2022) (striking down as vague campaign regulations invoked against retirees who gave presentations concerning the voting records of liberal Republican legislators in Montana); *Doctors for a Healthy Montana v. Fox*, 478 F. Supp. 3d 1068 (D. Mont. 2020) (striking down statute requiring political committees to use certain state-approved titles after legislator filed administrative complaint because of criticism of his voting record); *Nat'l Ass'n for Gun Rights, Inc. v. Motl*, 188 F. Supp. 3d 1020, 1035-36 (D. Mont. 2016) (striking down statute prohibiting criticisms of legislators' voting records without referencing particular votes by legislators).

6.      Montana's statute is constitutionally worse than either – much worse. California's deepfake law imposed no criminal sanctions and required proof of actual malice. Hawaii added criminal penalties but still demanded actual malice. Montana's Digital Censorship Act dispenses with that protection entirely. A speaker who "knew or should have known" that a communication contained a deepfake, Mont. Code Ann. § 13-35-802(1)(b), faces civil penalties for a first offense, misdemeanor prosecution for a second, and felony prosecution for a third — with all penalties cumulative. Subjecting core political speech about public figures to what is essentially a negligence standard snuffs out the breathing space the First Amendment demands.

7.      The Act's constitutional infirmities do not end there. Its key definitions are hopelessly vague. Its compelled disclaimer requires speakers to brand their own protected communications as false and deceptive as the price of speaking at all. Its narrow exceptions privilege institutional media over independent political speakers. And it applies only within 60 days of an election — not because the harms it purports to address are confined to that window, but because that is when political speech is most potent and most threatening to incumbents.

8.      That last point was confirmed by the legislators who enacted it. When the bill was heard in committee, Vice-Chair Representative Kelly Kortum praised

it because it "helps us defend our honor." That is not merely an impolitic remark. It is a candid admission that the Act's true aim is insulating legislators from criticism of their voting records, not protecting Montana voters from deception. That statement illustrates precisely why the First Amendment does not allow government officials to regulate political criticism through vague standards. Governments may not criminalize political speech to protect politicians from embarrassment, ridicule, or hurt feelings.

9.      Plaintiffs bring this action under 42 U.S.C. § 1983 seeking a facial and as-applied declaration that Mont. Code Ann. § 13-35-801, *et seq*., violates the First and Fourteenth Amendments to the United States Constitution.

## **JURISDICTION AND VENUE**

10.     This Court has subject-matter jurisdiction under 28 U.S.C. §§1331, 1343, 42 U.S.C. §1983, and the First and Fourteenth Amendments to the United States Constitution.

11.     Defendants reside in the Helena Division of this Court.

12.     Venue for this action thus properly lies in the Helena Division of this Court.

5

## PARTIES

13.     Plaintiff Accountability in State Government ("ASG") is a political committee duly registered with the Montana Commissioner of Political Practices, with its principal place of business in Fergus County, Montana.

14.     Plaintiff Dan Bartel is the registered treasurer of ASG and resides in Fergus County, Montana. As treasurer, Mr. Bartel bears legal responsibility for ASG's campaign finance compliance and faces direct exposure to all penalties and criminal sanctions authorized by the Digital Censorship Act.

15.     Defendant Austin Knudsen is the Attorney General for the State of Montana and resides in Lewis and Clark County, Montana. He has authority to conduct civil and criminal prosecutions of violations of the Digital Censorship Act.

16.     Defendant Kevin Downs is the County Attorney for Lewis and Clark County and resides in Lewis and Clark County, Montana. He has authority to conduct civil and criminal prosecutions of violations of the Digital Censorship Act.

17.     Defendant Chris Gallus is the Montana Commissioner of Political Practices and resides in Lewis and Clark County, Montana. He is vested with authority to receive and investigate complaints alleging violations of the Digital Censorship Act, to make sufficiency findings, and to refer matters for civil and criminal prosecution under the Act — or, if returned by the county attorney, to prosecute those matters himself.

18.    All Defendants are sued in their official capacity only.

## STATEMENT OF FACTS

### A. Representative Jennifer Carlson's Legislative Record

19.    Jennifer Carlson was elected to represent Montana House District 69 in the 2021 and 2023 legislative sessions.

20.    During the 2023 legislative session, Representative Carlson voted for HB 9 (2023), an appropriations bill directing state funding to a number of ideologically-driven programs and organizations, including a DEI film festival, a theatrical production entitled "Diversity Day," a panel on "LGBTIQ2S + History," transgender art projects, and nude art displays.

21.    Representative Carlson sought election in House District 68 in 2024 but was defeated in the primary.

22.    Representative Carlson is again seeking election to House District 68 in the current primary for 2026.

### B. The Montana Legislature's Enactment of the Digital Censorship Act

23.    During the 2025 legislative session, the Montana Legislature enacted SB 25 which was later enrolled as Mont. Code Ann. § 13-35-801 *et seq*.

24.    Legislative hearings produced testimony and admissions that illuminate both the Act's enforcement mechanisms and its enforcement difficulties. Scott Cook, an investigator for the Commissioner's office, testified before a Senate

7

committee on January 22, 2025, that complaints brought under the Act would likely require his office to retain outside experts simply to determine whether AI was involved in producing the underlying communication.

25. The Act's chief House sponsor was equally candid about its reach. Representative Julie Darling, chair of the House committee that received the bill after Senate passage, admitted on the House floor on April 8, 2025: "I think AI confuses everybody."

26. Governor Greg Gianforte signed the bill into law on May 8, 2025.

## C. The Digital Censorship Act's Key Provisions

27. The Act targets a broad category of speech it labels "deepfakes," defined as "AI-generated content or synthetic media that depicts a candidate or political party with the intent to injure the reputation of the candidate or party or otherwise deceive a voter." Mont. Code Ann. § 13-35-801(3). "Synthetic media" is defined to include content created with "generative artificial intelligence or other digital technology." *Id.* § 13-35-801(5).

28. The Act's core prohibition is sweeping. It prohibits any person, corporation, committee, political party, or other entity "working in an official election capacity" from paying for or sponsoring the production, creation, or distribution of a campaign communication that the person or entity "knew or should have known" constitutes a deepfake of a candidate or political party on the

ballot — and does so within 60 days of the initiation of voting in any election. Mont. Code Ann. § 13-35-802(1)(a).

29.     The Act's prohibition is not limited to content that is demonstrably false. Rather, it extends to any AI-generated content that "provides a reasonable person a fundamentally different understanding or impression of the appearance, action, or speech than a reasonable person would have from the unaltered, original version." Mont. Code Ann. § 13-35-802(3)(b). That sweeping standard engulfs legitimate political commentary for which AI and other digital software tools are used to illustrate or dramatize a candidate's actual record.

30.     The Act purports to provide an escape hatch: a communicator may avoid the prohibition by including a mandated disclosure statement reciting that the content "has been significantly edited by artificial intelligence and depicts speech or conduct that falsely appears to be authentic or truthful." Mont. Code Ann. § 13-35-802(1)(b). But this compelled-speech remedy is itself constitutionally infirm, as it forces political speakers to brand their own constitutionally protected communications as false and deceptive as the price of speaking at all.

31.     The Act's disclosure requirements are onerous. For printed communications, the disclosure must appear in bold font of at least 12 points. For television or video communications, it must be "clearly readable throughout the communication" and occupy at least 4% of the vertical picture height. For audio

communications, it must run at least 8 seconds and be spoken at either the beginning or the end of the communication. Mont. Code Ann. § 13-35-802(1)(c).

32. The Act's exceptions are discriminatory. Broadcasters, streaming services, and media organizations are expressly exempt when transmitting deepfakes as part of bona fide newscasts, news documentaries, or news events, and when paid to broadcast deepfakes by candidates. Mont. Code Ann. § 13-35-802(2). In fact, any speaker who is not "working in an official election capacity," an unidentified and vague term, is exempt from the Act. Mont. Code Ann. § 13-35-802(1)(a). Institutional media may traffic in deepfakes; independent political speakers may not. That is speaker-based discrimination of the kind the First Amendment condemns.

33. The Act establishes an escalating and cumulative penalty structure. A first sufficiency finding subjects the offender to civil penalties under Mont. Code Ann. § 13-35-804(1). A second triggers mandatory referral to the county attorney for misdemeanor prosecution — a fine of up to $500, imprisonment up to six months, or both. Mont. Code Ann. § 13-35-804(2). A third mandates referral to the Attorney General or county attorney for felony prosecution — a fine of up to $5,000, imprisonment in state prison up to two years, or both. Mont. Code Ann. § 13-35-804(3). All penalties are cumulative. Mont. Code Ann. § 13-35-804(4).

34. The Act also authorizes aggrieved candidates and their political parties to seek injunctive relief, actual damages, and up to $10,000 in punitive damages in any court of equitable jurisdiction, with such actions to be expedited and given preference over all other pending matters upon a showing of present or ongoing harm. Mont. Code Ann. § 13-35-803(4).

35. Taken together — vague and overly broad definitions, compelled speech, escalating criminal penalties, and expedited civil litigation — the Act erects a multi-layered regime designed to chill, suppress, and punish protected political speech at the precise moment it matters most: the 60 days before an election.

## D. **Plaintiffs' Protected Speech Exposing Representative Carlson's Voting Record**

36. ASG was registered as an independent political committee with the Commissioner of Political Practices on October 9, 2025. It is headquartered in Lewistown, Montana. Its mission is to promote honesty, openness, and responsibility in state government by providing Montanans with fact-based evaluations of legislative conduct and by holding elected officials accountable — both those who demonstrate integrity and those who do not.

37. ASG was founded by Dan Bartel, a lifelong Montanan and former member of both the Montana House of Representatives and the Montana Senate,

where he earned wide respect for fiscal discipline, rigorous oversight of government operations, and principled advocacy for Montana's rural communities.

38.    Consistent with its core mission, ASG engages in and intends to continue to engage in election communications and electioneering communications — including communications that may incorporate digitally created or edited content with some use of AI technology — to inform Montana voters about the legislative records of their elected representatives. That speech is squarely protected by the First Amendment. It is precisely that speech which the Act targets, suppresses, and threatens to criminalize.

39.    In early 2026, Representative Jennifer Carlson announced her candidacy for House District 68. In response, ASG determined to exercise its First Amendment right to inform voters in HD 68 of Representative Carlson's legislative record — specifically, her vote to appropriate state funds for the ideologically-driven programs described above.

40.    On April 10, 2026, ASG caused to be delivered 1,872 campaign mailers to households in Montana House District 68, a district that includes Belgrade, Churchill, and Amsterdam.

41.    The mailer was designed and printed by Resolve Campaigns, LLC.

42.    The front and back sides of the Carlson mailer are reproduced below:



43.    The mailer criticized Representative Jennifer Carlson for voting for HB 9 (2023), identified the activities funded, and urged voters to reject her candidacy. It included authentic photographs of Representative Carlson. Resolve Campaigns used synthetic media to add a "pride" flag to Representative Carlson's hand and a preferred pronoun button with the words "SHE/HER" to her sweater. The mailer also included digitally rendered images of clouds for its background.

44.    On or after April 10, 2026, ASG caused a similar mailer to be delivered to households in Montana House District 28 concerning Representative Eric Albus, who also voted for HB 9 (2023). It included authentic photographs of Representative Albus and digitally created images of a "pride" flag, preferred

pronoun button, and background clouds. The front and back sides of the Albus

mailer are reproduced below:



45.    On or after April 26, 2026, ASG caused multiple mailers to be

delivered to households in Montana Senate District 9 concerning Representative

Llew Jones, who is currently seeking the Republican nomination for SD 9. The

mailers highlighted Jones' votes for controversial bills such as HB 473 (2017), a

bill to raise gas taxes. It includes authentic images of Jones and an image of a gas

pump placed in his left hand pouring out ten-dollar bills. This is precisely the kind

of expressive communication that the First Amendment protects. While the image

may be captured by the Act's vague and overly broad terms, no voter would miss

the obvious point and mistake the image for reality.  They would know that the gas

pump is illustrative. The front and back of the mailer is reproduced below:





## E. **The State's Investigation of Plaintiffs' Protected Speech**

46.    Representative Carlson filed an administrative complaint dated April

20, 2026, with Commissioner Gallus against ASG and Senator Bartel. A true and

correct copy of the complaint is attached as **Exhibit 1.**

15

47.    On April 29, 2026, Commissioner Gallus sent a letter to ASG and Senator Bartel. A true and correct copy of Commissioner Gallus' letter is attached as **Exhibit 2.**

48.    Commissioner Gallus's letter informed Plaintiffs that Representative Carlson's complaint "conforms to the requirements of 44.11.106 ARM." That rule requires that "the commissioner shall investigate the alleged violation," "shall prepare a written summary of facts and statement of findings," and may take "other appropriate action." Admin. R. Mont. 44.11.106(3). The Commissioner's investigation of Plaintiffs' protected speech is now underway.

49.    Commissioner Gallus also included the following paragraph in his letter to Plaintiffs:

> If violations are found to have occurred and prosecution is determined to be justified, this matter will be referred to the local county attorney. The local county attorney then determines whether they will prosecute the matter or refer it back to me. MCA § 13-37-124. If returned to me, I will either work with the responding party to settle the matter or prosecute it within their local jurisdiction in district court. Penalties, if any, are imposed based upon MCA §13-37-128.

50.    Commissioner Gallus's letter went further still. It warned Plaintiffs that "due to the severity of the penalty, I feel compelled to provide you with the relevant statute in this regard" — and then attached Mont. Code Ann. § 45-7-207, Montana's criminal statute prohibiting tampering with or fabricating physical evidence. The implicit threat could not be clearer: comply or face consequences

that extend beyond campaign finance law into the criminal code. That threat, standing alone, chills protected speech and demonstrates the irreparable harm Plaintiffs suffer every day this Act remains in force.

51.    Representative Albus filed an administrative complaint dated May 4, 2026, with Commissioner Gallus against ASG and Senator Bartel. A true and correct copy of the complaint is attached as **Exhibit 3.**

52.    On May 5, 2026, Commissioner Gallus sent a letter to ASG and Senator Bartel instructing them to respond to the Albus complaint. A true and correct copy of Commissioner Gallus' letter is attached as **Exhibit 4.**

53.    On May 4, 2026, Ross Fitzgerald filed an administrative complaint dated May 4, 2026 with Commissioner Gallus against ASG and Senator Bartel relating to the Jones mailers. A true and correct copy of the complaint is attached as **Exhibit 5.**

54.    On May 5, 2026, Commissioner Gallus sent a letter to ASG and Senator Bartel instructing them to respond to the Fitzgerald complaint. A true and correct copy of Commissioner Gallus' letter is attached as **Exhibit 6.**

**FIRST CAUSE OF ACTION**
**Violation of the First Amendment to the United States Constitution**
**(42 U.S.C. § 1983)**

55.     Plaintiffs reallege and incorporate by reference each allegation set forth above.

56.     The First Amendment's Free Speech Clause protects Plaintiffs' ability to create, publish, and distribute their speech. The Fourteenth Amendment incorporates the First Amendment against the States.

57.     The First Amendment also protects Plaintiffs' right to be free from content, viewpoint, and speaker-based discrimination, overbroad restrictions on speech, compelled speech and vague laws allowing unbridled discretion by enforcement officials.

58.     Dan Bartel and ASG engage in activities protected by the First Amendment when they create, publish, or distribute their own speech or republish the speech of others.

59.     The Digital Censorship Act uses governmental authority and the threat of civil and criminal punishment to suppress speech critical of Montana legislators or other candidates.

60.     The Digital Censorship Act constitutes an impermissible and unreasonable restriction of protected speech because it burdens substantially more speech than is necessary to further any compelling governmental interest.

61.    As applied and facially, the Digital Censorship Act bars and chills speech based on content and viewpoint.

62.    As applied and facially, the Digital Censorship Act is not content-neutral because it targets only "deepfakes," and only a certain subset of that kind of speech. Specifically, it targets speech constituting "AI-generated content or synthetic media that depicts a candidate or political party with the intent to injure the reputation of the candidate or party or otherwise deceive a voter."

63.    The Digital Censorship Act is not viewpoint-neutral because it singles out content made with "the intent to injure the reputation" of a candidate or party but not neutral content or content intended to enhance the reputation of a candidate or party.

64.    The Digital Censorship Act is unconstitutional as applied to Plaintiffs' speech because the Act is a content-based and viewpoint-based regulation that bans, chills, and burdens their desired speech.

65.    Because the Act regulates core political speech based on content, viewpoint, and speaker identity, it is presumptively unconstitutional and must satisfy strict scrutiny.

66.    The Act is not narrowly tailored to serve any compelling governmental interest. The State has no compelling interest in suppressing political criticism merely because it employs AI-assisted imagery. Existing defamation,

fraud, voter-intimidation, and election-interference laws address cognizable harms through narrower, historically recognized tools. Counter-speech and ordinary political response are also less restrictive alternatives.

67.     As applied to Plaintiffs, the Digital Censorship Act compels speech they object to, interferes with their editorial judgment, and compels them to publish and disseminate speech they object to.

68.     As applied to Plaintiffs, the Digital Censorship Act is vague and allows Defendants unbridled discretion to evaluate Plaintiffs' speech and then discriminate against it based on content and viewpoint in determining whether to apply the Act. The Act's unconstitutionally vague phrases include the definition of a "deepfake," which "appears to a reasonable person to depict an individual saying or doing something that did not occur in reality" or "provides a reasonable person a fundamentally different understanding or impression of the appearance, action, or speech than a reasonable person would have from the unaltered, original version of the image, audio recording, or video recording." Mont. Code Ann. § 13-35-801(3). Persons and entities are subject to the Act when they are "working in an official election capacity," a phrase that is not defined. Mont. Code Ann. § 13-35-802(1)(a). A safe harbor exists for campaign material that is "minimally edited, adjusted, or enhanced by generative artificial intelligence in a manner that does not materially alter the meaning or significance that a reasonable person understands

from the content." Mont. Code Ann. § 13-35-801(1)(b). No guidance is provided as to how these terms should be interpreted.

69.    The Digital Censorship Act is substantially overbroad in relation to any legitimate sweep and is facially unconstitutional for that reason.

70.    The Digital Censorship Act is substantially overbroad because it regulates speech about public figures not only when there is actual malice, but also in cases where there is mere negligence, *i.e.*, when a publisher "knew or should have known" that the communication was a "deepfake." Mont. Code Ann. § 13-35-802(1)(a).

71.    The Digital Censorship Act is also substantially overbroad because it applies not only to speech that actually injures the reputation of a candidate or party but also to speech made with "*the intent* to injure the reputation of a candidate or party."

72.    The Digital Censorship Act does not serve any compelling interest in a narrowly tailored manner.

73.    Accordingly, facially and as applied to Plaintiffs, the Digital Censorship Act violates the First Amendment's protections for free speech.

21

## SECOND CAUSE OF ACTION
### Violation of the Fourteenth Amendment to the United States Constitution
### (42 U.S.C. § 1983)

74.    Plaintiffs reallege and incorporate by reference each allegation set forth above.

75.    The Fourteenth Amendment's Due Process Clause prohibits the government from restricting speech through vague standards that fail to give speakers fair notice of what is prohibited and that confer unbridled discretion on government officials to prohibit disfavored speech.

76.    Due process requires that people of ordinary intelligence be able to understand what conduct a given statute or regulation prohibits. Statutes that fail to provide this fair notice and clear guidance are void for vagueness.

77.    Statutes that authorize or even encourage arbitrary or viewpoint-discriminatory enforcement are void for vagueness.

78.    Bartel, ASG, and third parties of ordinary intelligence cannot know what content is prohibited by the Digital Censorship Act.

79.    The Digital Censorship Act chills and restrains original content-creators as well as those wishing to republish certain content prohibited by the Act, subjecting them to civil and criminal sanctions for their speech.

80.    The Digital Censorship Act does not provide fair notice of what it prohibits.

81.    The Digital Censorship Act authorizes and encourages discriminatory enforcement.

82.    Defendants can use this vagueness, and the unbridled discretion it provides, to apply the Digital Censorship Act in a way that discriminates against content, viewpoints, and actions Defendants disfavor.

83.    Accordingly, facially and as applied to Plaintiffs, the Digital Censorship Act violates the Fourteenth Amendment's Due Process Clause and chills protected speech.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request the following relief from this Court:

A. A declaration that the Digital Censorship Act, as applied to Plaintiffs and similarly situated speakers, has violated and continues to violate their First Amendment and Fourteenth Amendment rights under the United States Constitution;

B. A declaration that the Digital Censorship Act facially violates the First Amendment's protections for speech and the Fourteenth Amendment's protections for due process;

C. An award of Plaintiffs' costs and expenses in this action, including reasonable attorney's fees under 42 U.S.C. § 1988;

D. Any other relief that the Court deems equitable and just in the circumstances.

DATED: May 6, 2026

Respectfully submitted,

MONFORTON LAW OFFICES, PLLC

/s/ Matthew G. Monforton
Matthew G. Monforton
Monforton Law Offices, PLLC
32 Kelly Court
Bozeman, Montana 59718
Telephone:  (406) 570-2949