Matthew G. Monforton (Montana Bar No. 5245)
Monforton Law Offices, PLLC
32 Kelly Court
Bozeman, Montana 59718
Phone: (406) 570-2949
Email: matthewmonforton@yahoo.com

Adam E. Schulman (DC Bar No. 1001606*)
HAMILTON LINCOLN LAW INSTITUTE
1629 K Street, NW Suite 300
Washington, DC 20006
Phone: (610) 457-0856
Email: adam.schulman@hlli.org
* admitted pro hac vice

## UNITED STATES DISTRICT COURT
## DISTRICT OF MONTANA
## HELENA DIVISION

| | |
|---|---|
| ACCOUNTABILITY IN STATE GOVERNMENT, a Montana independent political committee; DAN BARTEL<br><br>Plaintiffs,<br><br>v.<br><br>AUSTIN KNUDSEN, in his official capacity as Montana Attorney General; KEVIN DOWNS, in his official capacity as Lewis and Clark County Attorney; CHRIS GALLUS, in his official capacity as Montana Commissioner of Political Practices,<br><br>Defendants. | Case No. 26-CV-00038-H-SPW<br><br><br>**Brief in Support of Plaintiffs' Motion for Preliminary Injunction** |

i

**TABLE OF CONTENTS**

Table of Contents.................................................................................................. ii

Table of Authorities ............................................................................................. iii

Introduction ........................................................................................................... 1

Factual Background............................................................................................... 3

Legal Standard for Preliminary Injunction ...................................................... 6

Argument ................................................................................................................ 8

I.      Plaintiffs are likely to succeed on the merits because Montana's Digital Censorship Act infringes political speech based on content and viewpoint..................................................................................................... 8

        A.     The Act is an unconstitutional content and viewpoint-based regulation of political speech.............................................................. 9

        B.     The Act fails strict scrutiny. ............................................................. 11

        C.     The Act compels speech.................................................................... 19

        D.     The vague Act admits of arbitrary enforcement. ......................... 21

II.     Plaintiffs face irreparable harm................................................................. 24

III.    The balance of equities and public interest also support granting preliminary relief...................................................................................... 25

Conclusion ............................................................................................................ 27

Certificate of Compliance.................................................................................. 28

Certificate of Service .......................................................................................... 29

# TABLE OF AUTHORITIES

## **Cases**

*281 Care Comm. v. Arneson,*
    766 F.3d 774 (8th Cir. 2014) .......................................................11, 12, 14, 15, 16, 18

*Am. Bev. Ass'n v. City & Cty. of San Francisco,*
    916 F.3d 749 (9th Cir. 2019) ........................................................3, 6, 20, 25

*Alario v. Knudsen,*
    704 F. Supp. 3d 1061 (D. Mont. 2023)................................................................6, 27

*Ashcroft v. ACLU,*
    542 U.S. 656 (2004) ....................................................................................... 7

*The Babylon Bee, LLC v. Lopez,*
    818 F. Supp. 3d 1181, 2026 WL 555552 (D. Haw. 2026) .......................... *passim*

*Bates v. Pakseresht,*
    146 F.4th 772 (9th Cir. 2025)............................................................ 7, 10, 11

*Brown v. Hartlage,*
    456 U.S. 45 (1982) ............................................................................... 16

*Bullfrog Films, Inc. v. Wick,*
    847 F.2d 502 (1988) ..................................................................................22

*Butcher v. Knudsen,*
    38 F.4th 1163 (9th Cir. 2022) ....................................................... 9, 21, 22

*City of Chicago v. Morales,*
    527 U.S. 41 (1999) ..................................................................................22

*Cohen v. California,*
    403 U.S. 15 (1971) ..................................................................................23

*Commonwealth v. Lucas,*
    34 N.E.3d 1242 (Mass. 2015) ................................................................. 12

*Crawford v. Marion Cnty. Election Bd.,*
    553 U.S. 181 (2008) ................................................................................ 13

*Cuviello v. City of Vallejo,*
    944 F.3d 816 (9th Cir. 2019) ................................................................. 25

*FCC v. Fox Television,*
    567 U.S. 239 (2012) ............................................................................... 21

*FEC v. Ted Cruz for Senate,*
    596 U.S. 289 (2022) .................................................................... 12, 14, 15

*Free Enter. v. Tex. Ethics Comm'n,*
    732 F.3d 535 (5th Cir. 2013) ................................................................. 12

*Garcia v. Cnty. of Alameda,*
    150 F.4th 1224 (9th Cir. 2025) .............................................................. 10

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal,*
    546 U.S. 418 (2006) .................................................................................. 7

*Grimmett v. Freeman,*
    59 F.4th 689 (4th Cir. 2023) .............................................................11, 18

*Houston Cmty. Coll. Sys. v. Wilson,*
    595 U.S. 468 (2022) ............................................................................... 19

*Iancu v. Brunetti,*
    588 U.S. 388 (2019) ........................................................................7, 9, 11

*IMDB.com, Inc. v. Becerra,*
    962 F.3d 1111 (9th Cir. 2020) .............................................................8, 13

*Jorgensen v. Cassiday,*
    320 F.3d 906 (9th Cir. 2003) ...................................................................... 27

*Junior Sports Mags. Inc. v. Bonta,*
    80 F.4th 1109 (9th Cir. 2023) .................................................................... 10

*Kohls v. Bonta,*
    752 F. Supp. 3d 1187 (E.D. Cal. 2024) ............................................ *passim*

*Kohls v. Bonta,*
    797 F. Supp. 3d 1177 (E.D. Cal. 2025) ............................................ *passim*

*Kolender v. Lawson,*
    461 U.S. 352 (1983) .................................................................................... 24

*Klein v. City of San Clemente,*
    584 F.3d 1196 (9th Cir. 2009) ............................................................. 24, 26

*Lackey v. Stinnie,*
    604 U.S. 192 (2025) ...................................................................................... 8

*Matal v. Tam,*
    582 U.S. 218 (2017) ............................................................................ 7, 10, 11

*McCullen v. Coakley,*
    573 U.S. 454 (2014) ...................................................................................... 9

*Melendres v. Arpaio,*
    695 F.3d 990 (9th Cir. 2012) ...................................................................... 26

*Minnesota Voters Alliance v. Mansky,*
    585 U.S. 1 (2018) ........................................................................... 9, 10, 14, 24

*Nat'l Institute of Family & Life Advocates v. Becerra,*
    585 U.S. 755 (2018) .......................................................................... 19, 20, 26

*Nat'l Rifle Ass'n v. Vullo,*
    602 U.S. 175 (2024) ........................................................................................... 9

*Neb. Press Ass'n v. Stuart,*
    423 U.S. 1327 (1975) ........................................................................................24

*NetChoice, LLC v. Bonta,*
    113 F.4th 1101 (9th Cir. 2024) ......................................................................17

*NRA of Am. v. City of Los Angeles,*
    441 F. Supp. 3d 915 (C.D. Cal. 2019) ........................................................... 8

*Pacific Gas & Elec. Co. v. Pub. Utilities Comm'n,*
    475 U.S. 1 (1986) .............................................................................................21

*Pierce v. Jacobsen,*
    44 F.4th 853 (9th Cir. 2022) ........................................................................7, 8

*Progressive Democrats for Soc. Justice v. Bonta,*
    73 F.4th 1118 (9th Cir. 2023) ........................................................................12

*R.A.V. v. St. Paul,*
    505 U.S. 377 (1992) ........................................................................................... 9

*Reed v. Town of Gilbert,*
    576 U.S. 155 (2015) ........................................................................................... 9

*Sackett v. EPA,*
    598 U.S. 651 (2023) ..........................................................................................22

*Smith v. Goguen,*
    415 U.S. 566 (1974) ..........................................................................................23

*Susan B. Anthony List v. Driehaus,*
    814 F.3d 466 (6th Cir. 2016) ..........................................................11, 16, 18, 24

*Susan B. Anothony List v. Driehaus,*
 573 U.S. 149 (2014) ........................................................................25

*Texans for Free Enter. v. Tex. Ethics Comm'n,*
 732 F.3d 535 (5th Cir. 2013) ........................................................12

*Thalheimer v. City of San Diego,*
 645 F.3d 1109 (9th Cir. 2011) .........................................................7

*Thomas v. Collins,*
 323 U.S. 516 (1945) ........................................................................19

*United States v. Alvarez,*
 567 U.S. 709 (2012) ........................................................ 1, 12, 15, 17, 26

*United States v. Stevens,*
 559 U.S. 460 (2010) ..........................................................................1

*United States v. Tan Duc Nguyen,*
 673 F.3d 1259 (9th Cir. 2012) ......................................................14

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council,*
 425 U.S. 748 (1976) ..........................................................................3

*Victory Processing, LLC v. Fox,*
 937 F.3d 1218 (9th Cir. 2019) ........................................................9

*Whitney v. California,*
 274 U.S. 357 (1927) ....................................................................26-27

*X Corp. v. Bonta,*
 116 F.4th 888 (9th Cir. 2024) .............................................1, 8, 13, 14, 20

*Zarate v. Younglove,*
 86 F.R.D. 80 (C.D. Cal. 1980) ......................................................23

## Constitutional Provisions

U.S. CONST. amend. I ....................................................................................................... *passim*

## Rules and Statutes

Fed. R. Civ. P. 65(c) ............................................................................................. 27

Mich. Comp. Laws § 168.932f(1) ........................................................................ 2

Mont. Code Ann. § 13-35-801 ..................................................................... *passim*

Mont. Code Ann. § 13-25-218 ..................................................................... 13-14

## Other Authorities

Carl T. Bergstrom & Jevin D. West,
    CALLING BULLSHIT, THE ART OF SKEPTICISM IN A DATA-DRIVEN WORLD
    (2020) ...................................................................................................... 23

Eugene Volokh, *When are Lies Constitutionally Protected*,
    4 J. FREE SPEECH L. 685 (2024) ......................................................... 13

## INTRODUCTION

The American people have been criticizing politicians—using hyperbole, imitation, impersonation, and symbolism, among other means—since before this country was founded. But Montana, alongside several other states, has now embarked on a crusade to combat political "misinformation" by criminalizing political speech that employs AI-generated "deepfakes" of political candidates. *See* Mont. Code Ann. §§ 13-35-801, *et seq* (hereinafter the "Digital Censorship Act"[1] or just the "Act.").

Two courts to date have addressed the First Amendment questions raised by statutes prohibiting political deepfakes. As both determined, such laws violate the Free Speech Clause. *See Kohls v. Bonta*, 797 F. Supp. 3d 1177, 1189 (E.D. Cal. 2025) ("*Kohls II*"); *The Babylon Bee, LLC v. Lopez*, 818 F. Supp. 3d 1181, 2026 WL 555552 (D. Haw. 2026). Like California's and Hawaii's before it, Montana's legislature has no "freewheeling authority to declare new categories of speech outside the scope of the First Amendment." *X Corp. v. Bonta*, 116 F.4th 888, 900 (9th Cir. 2024) (quoting *United States v. Stevens*, 559 U.S. 460, 472 (2010)). False political speech is neither "historically unprotected" nor does it fit within any "tradition of proscription." *United States v. Alvarez*, 567 U.S. 709, 722 (2012); *accord Kohls*, 797 F. Supp. 3d at 1184-85; *Babylon Bee*, 2026 WL 555552, at *12; *Kohls v. Bonta*, 752 F. Supp. 3d 1187, 1194 (E.D. Cal. 2024) ("*Kohls I*"). Although generative

---

[1] To be clear, this is our appellation; it does not come from the Act itself.

AI technology is novel, "'the basic principles' of the First Amendment 'do not vary' and courts must ensure that speech, especially political or electoral speech, is not censored for its ideas, subject matter, or content." *Kohls I*, 752 F. Supp. 3d at 1199 (quoting *Brown v. Entm't Merchants Ass'n*, 564 U.S. 786, 792 (2011)).

This Court should reach the same conclusion with respect to Montana's Digital Censorship Act, which is even more sweeping and punitive than the statutes in *Kohls* or *Babylon Bee*. The Act extends the civil penalties under California's law to *criminalize* speech. It loosens the *mens rea* required for a violation, from the "knowing" "malice" required in California and the "reckless[ness]" required in Hawaii, to mere negligence in distributing. *See* § 13-35-802 ("knew or should have known"). And it even severs the already attenuated link in other states' laws to the infliction of harm. *Compare, e.g., Kohls*, 752 F. Supp. 3d at 1193 (covering "any false or materially deceptive content that is 'reasonably likely' to harm the 'reputation or electoral prospects of a candidate'"); Mich. Comp. Laws § 168.932f(1) (proscribing political deepfakes distributed with "intent to harm the reputation or electoral prospects of a candidate in an election, *and the distribution is reasonably likely to cause that result*"), *with* Mont. Code Ann. § 13-35-801(3) (covering any content "made with the intent to injure…or otherwise deceive" regardless of result).

Montana is free to enforce its speech-neutral prohibition against voter interference and coercion. *See* Mont. Code Ann. § 13-25-218. It is free to pass new narrowly-tailored laws that target actual harm, and do not discriminate based on

content and viewpoint. *Kohls II*, 797 F. Supp. 3d at 1186. It is free to adopt initiatives to enhance digital and political literacy. *Babylon Bee*, 2026 WL 555552, at *14. Most importantly, both Montana itself and all Montanans are free to engage in counterspeech. *Babylon Bee*, 2026 WL 555552, at *13; *Kohls II*, 797 F. Supp. 3d at 1187. "Especially as to political speech, counter speech is the tried and true buffer and elixir, not speech restriction." *Kohls I*, 752 F. Supp. 3d at 1191 (internal quotations omitted).

But no state has the authority to turn off the flow of political information or shudder the marketplace of ideas. "[T]he First Amendment makes [the choice] for us." *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council*, 425 U.S. 748, 770 (1976). Montana's Act is unconstitutional.

## FACTUAL BACKGROUND

Montana's 2025 Digital Censorship Act criminalizes the sponsorship of messages about political candidates or parties that use "Deepfake" content within 60 days of the start of voting in any given election. Mont. Code Ann. §§ 13-35-802, 13-35-804. The Act defines "Deepfake" as AI-generated or synthetic content "depict[ing] an individual saying or doing something that did not occur in reality" or "provid[ing] a reasonable person a fundamentally different understanding or impression of the appearance, action, or speech than a reasonable person would have from the unaltered, original version of the image, audio recording, or video recording" created with an intent to either "injure the reputation of the candidate or party or otherwise deceive a voter." § 13-35-801(3).

3

The Act authorizes aggrieved candidates or political parties to bring private litigation against the speaker, in expedited fashion, for an injunction and statutory damages up to $10,000 without any showing of actual damages. § 13-35-803. It also authorizes aggrieved candidates to file administrative complaints with the Commissioner of Political Practices that can lead to civil penalties, misdemeanor prosecution, and then eventually felony prosecution. § 13-35-804.

Plaintiffs (collectively "Bartel" or "Plaintiffs") are Dan Bartel, a lifelong Montanan and former state legislator, and his political committee, Accountability in State Government. Complaint ¶¶13-14, 36-37. To hold elected officials accountable, they engage in the most core First Amendment activity: pure political speech, in the form of distributing mailers that inform voters about the legislative records of candidates and officials. Complaint ¶38; Declaration of Dan Bartel ¶5. These mailers regularly use realistic AI-generated and synthetic content to make their point. For example, two of the mailers from this most recent cycle portrayed candidates wearing preferred-pronoun pins and wielding pride flags to vividly symbolize the ideological character of legislation they supported. Complaint ¶¶1, 39-44.  A third mailer portrayed a candidate gripping a gas pump, with dollar bills pouring out of the nozzle and the price reading "Arm" and a "Leg," highlighting that candidate's vote for a gas tax hike. Complaint ¶45. The subjects of these ads and their campaign affiliates were displeased; weaponizing the Digital Censorship Act, they lodged administrative complaints

4

against Bartel with the Commissioner of Political Practices. Complaint ¶¶46-54 & Exs. 1, 3, 5 to Complaint.

The Act privileges certain speakers. Newsmedia outlets may broadcast a deepfake, either as part of a bonafide newscast or paid advertisement. Mont. Code Ann. § 13-35-802(2)(a)-(b). The Act exempts other distribution platforms that publish advertisements. § 13-35-802(2)(d). It only covers speakers who are working in "an official election capacity," although it nowhere defines what that phrase means. § 13-35-802(1)(a).

The Act also carves out an undefined category of deepfakes that "constitute[] satire or parody." Mont. Code Ann. § 13-35-802(2)(c). Finally, it permits deepfakes that include a verbatim state-drafted disclosure: "This _____ (image/audio/video/multimedia) has been significantly edited by artificial intelligence and depicts speech or conduct that falsely appears to be authentic or truthful." § 13-35-802(1)(b). Such disclosures must satisfy rigid size, font, and duration requirements. § 13-35-802(1)(c). Thus, the Act both prohibits speech and compels it, for speakers like Bartel who do not wish to transmit the state's message. *See* Bartel Decl. ¶ 15.

In connection with the November 3, 2026 general election, Bartel would like to sponsor political advertisements that risk liability under the Act but is chilled by the specter of another complaint and the threat of liability. *See* Bartel Decl. ¶ 18. Bartel requests that this Court enter an injunction against enforcement of the Act so that he may speak freely in early October.

## LEGAL STANDARD FOR PRELIMINARY INJUNCTION

Four factors determine whether a court should issue a preliminary injunction: (1) whether the plaintiff is likely to succeed in the litigation; (2) whether the plaintiff will suffer irreparable harm absent the injunction; (3) the balance of equities; and (4) the public interest. *Am. Bev. Ass'n v. City & Cty. of San Francisco*, 916 F.3d 749, 754 (9th Cir. 2019) (*en banc*). With a constitutional claim, the test generally turns on the first factor. Where plaintiffs "have a colorable First Amendment claim, they have demonstrated that they will suffer irreparable harm if the [law] takes effect." *Id.* at 758. And "the fact that plaintiffs have raised serious First Amendment questions compels a finding that the balance of hardships tips sharply in plaintiffs' favor." *Id.* (simplified). Likewise, the Ninth Circuit "has consistently recognized the significant public interest in upholding First Amendment principles." *Id.* (internal quotation omitted). "Indeed, it is always in the public interest to prevent the violation of a party's constitutional rights." *Id.* (internal quotation omitted).[2]

To determine whether a First Amendment plaintiff can demonstrate a likelihood of success, the Ninth Circuit has framed a burden-shifting approach where "the moving party bears the initial burden of making a colorable claim that

_____

[2] The Ninth Circuit treats these factors as a sliding scale, such that if "the balance of hardships tips sharply in [plaintiffs'] favor, there is a likelihood of irreparable injury, and the injunction is in the public interest, they need only show 'serious questions' on the merits.'" *Alario v. Knudsen*, 704 F. Supp. 3d 1061, 1072 (D. Mont. 2023) (quoting *Where Do We Go Berkeley v. Cal. Dep't of Transp.*, 32 F.4th 852, 859 (9th Cir. 2022)).

its First Amendment rights have been infringed, or are threatened with infringement, at which point the burden shifts to the government to justify the restriction." *Thalheimer v. City of San Diego*, 645 F.3d 1109, 1116 (9th Cir. 2011). "As the Government bears the burden of proof on the ultimate question of [the law's] constitutionality, [plaintiffs] must be deemed likely to prevail unless the Government has shown [that the law satisfies the applicable legal standard]." *Ashcroft v. ACLU*, 542 U.S. 656, 666 (2004); *accord Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 429 (2006).

If the Court finds the law viewpoint-discriminatory on its face, that "end[s] the matter" and "renders unnecessary any extended treatment of other questions." *Iancu v. Brunetti*, 588 U.S. 388, 399 (2019); *Matal v. Tam*, 582 U.S. 218, 248 (2017) (Kennedy, J., concurring); *see also, Kohls II*, 797 F. Supp. 3d at 1183 (finding California's deepfake law discriminated based on viewpoint). If the Court finds the law is merely a content-based restriction, then strict scrutiny applies—"the most rigid and most searching judicial inquiry known to constitutional law." *Bates v. Pakseresht*, 146 F.4th 772, 784 (9th Cir. 2025) (internal quotation omitted).

Under strict scrutiny, the state bears the burden to demonstrate that the Act is narrowly tailored to meet a compelling government interest. *Pierce v. Jacobsen*, 44 F.4th 853, 862 (9th Cir. 2022). Among other things, the state must show that the law is the least restrictive alternative for advancing its interests. *X Corp.*, 116 F.4th at 903; *IMDB.com, Inc. v. Becerra*, 962 F.3d 1111, 1125-27 (9th Cir. 2020); *Kohls I*, 752

7

F. Supp. 3d at 1195-96 (concluding that California's political deepfake ban failed this requirement).

Preliminary injunction "procedures" are "customarily" "less formal" and "evidence" "less complete than in a trial on the merits." *Lackey v. Stinnie*, 604 U.S. 192, 200 (2025). "Because of the extraordinary nature of injunctive relief, including the potential for irreparable injury if not granted, a district court may consider evidence outside the normal rules of evidence, including: hearsay, exhibits, declarations, and pleadings." *NRA of Am. v. City of Los Angeles*, 441 F. Supp. 3d 915, 926 (C.D. Cal. 2019).

## ARGUMENT

**I.    Plaintiffs are likely to succeed on the merits because Montana's Digital Censorship Act unconstitutionally regulates core political speech.**

For four independent reasons, Plaintiffs' constitutional claims are likely to succeed. First, the Act discriminates against political speech based on content and viewpoint. Second, the state has no compelling interest in preventing the mailers at issue (or any AI-generated content) about political candidates; the Act is not narrowly tailored to any compelling interests. Third, the Act compels speech by demanding speakers disclose their use of AI editing. Fourth, the Act suffers from vagueness fatal to the regulation of core political speech.

**A.   The Act is an unconstitutional content and viewpoint-based regulation of political speech.**

Content-based regulations, which target speech based on its topic, idea, or message, are "presumptively invalid." *R.A.V. v. St. Paul*, 505 U.S. 377, 382 (1992). A law is content-based if it "draws distinctions based on the message a speaker conveys" through either "subject matter," "function[,] or purpose." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). In other words, if "enforcement authorities [need] to examine the content of the message that is conveyed to determine whether a violation has occurred," then the law is facially content-based and presumptively unconstitutional. *McCullen v. Coakley*, 573 U.S. 464, 479 (2014) (cleaned up). This is especially so for laws that target political speech, since this speech "occupies the highest rung of the hierarchy of First Amendment values." *Butcher v. Knudsen*, 38 F.4th 1163, 1169 (9th Cir. 2022) (internal quotation omitted); *accord Victory Processing, LLC v. Fox*, 937 F.3d 1218, 1223 (9th Cir. 2019) (laws that disfavor political speech "strike[] at the heart of the First Amendment").

If a government entity chooses to regulate speech, it may not do so in a way that discriminates against certain viewpoints. Viewpoint discrimination is "uniquely harmful to a free and democratic society." *Nat'l Rifle Ass'n v. Vullo*, 602 U.S. 175, 187 (2024). Thus, if a law is "viewpoint-based, it is unconstitutional." *Iancu v. Brunetti*, 588 U.S. 388, 393 (2019); *accord Minn. Voters Alliance v. Mansky*, 585 U.S. 1, 11 (2018) ("prohibited"); *Matal v. Tam*, 582 U.S. 218, 243 (2017) ("forbidden"); *Junior Sports Mags. Inc. v. Bonta*, 80 F.4th 1109, 1124 (9th Cir. 2023)

(VanDyke, J., concurring) ("*per se* invalid"). At the very least, viewpoint discrimination triggers strict scrutiny. *Bates*, 146 F.4th at 784-85.

The Digital Censorship Act discriminates based both on content and on viewpoint. It discriminates on content because it "requires enforcement authorities to examine the content of the message that is conveyed"—specifically, whether it is a "deepfake" of a candidate or political party—"to determine whether a violation has occurred." *Garcia v. Cnty. of Alameda*, 150 F.4th 1224, 1232 (9th Cir. 2025) (internal quotation omitted).

As to viewpoint, "the test … is whether—within the relevant subject category—the government has singled out a subset of messages for disfavor based on the views expressed." *Matal*, 582 U.S. at 248 (Kennedy, J., concurring). A rule prohibiting denigrating—but not laudatory—speech about certain characteristics discriminates based on viewpoint by prohibiting only one perspective on a given subject. *See id.* So too does a rule that "requires positive speech and restricts negative speech" on certain political or social issues. *Bates*, 146 F.4th at 785. The First Amendment safeguards citizens' rights to speak and to hear all available views (both positive and negative) on any particular topic; it ensures that the government does not pick winners and losers in the marketplace of ideas. Here, the Act permits positive deepfakes intended to bolster a candidate's reputation—like memes of Donald Trump praying or playing professional

10

football[3]—but prohibits derogative political content intended to harm a candidate's reputation—like memes of the President in a fascist's uniform. That's the "essence of viewpoint discrimination." *Kohls II*, 797 F. Supp. 3d at 1183 (quoting *Iancu*, 588 U.S. at 393); *Grimmett v. Freeman*, 59 F.4th 689, 694-96 (4th Cir. 2023) (invalidating law prohibiting "derogatory reports" about political candidates).

Because Section 338.055.7 is viewpoint discriminatory on its face, that "end[s] the matter" and "renders unnecessary any extended treatment of other questions." *Iancu*, 588 U.S. at 399; *Matal*, 582 U.S. at 248 (Kennedy, J., concurring).

### B.     The Act fails strict scrutiny.

Some Ninth Circuit law subjects viewpoint-discriminatory laws to the same strict-scrutiny analysis as content-based restrictions. *See, e.g., Bates*, 146 F.4th at 790. Under this analysis, the government must "demonstrate that its policy…is narrowly tailored in support of a compelling state interest." *Id.* at 798.

Montana cannot avoid strict scrutiny simply by invoking the stigma of "political misinformation." False political speech is still protected speech. *See, e.g., Susan B. Anthony List v. Driehaus*, 814 F.3d 466, 473-76 (6th Cir. 2016); *281 Care Committee v. Arneson*, 766 F.3d 774, 783-85 (8th Cir. 2014); *Commonwealth v. Lucas*,

---

[3] Maya Mehrara, *Trump Posts Fake Image of Himself as a Star Player*, NEWSWEEK (Oct. 21, 2024), https://www.newsweek.com/donald-trump-fake-image-nfl-star-pittsburgh-steelers-1972064.

34 N.E.3d 1242, 1248-52 (Mass. 2015); *Babylon Bee*; *Kohls II*; *Kohls I; see generally Alvarez*, 567 U.S. at 719.

The Supreme Court "has recognized only one permissible ground for restricting political speech: the prevention of 'quid pro quo' corruption or its appearance." *FEC v. Ted Cruz for Senate*, 596 U.S. 289, 305 (2022); *accord Texans for Free Enter. v. Tex. Ethics Comm'n*, 732 F.3d 535, 537 (5th Cir. 2013) (discussing *Citizens United v. FEC*, 558 U.S. 310, 365 (2010)). It has "consistently rejected attempts to restrict campaign speech based on other legislative aims" because, "[h]owever well intentioned," they would "tamper with the right of citizens to choose who shall govern them." *Ted Cruz for Senate*, 596 U.S. at 305-06 (internal quotation omitted); *accord Progressive Democrats for Soc. Justice v. Bonta*, 73 F.4th 1118, 1133 (9th Cir. 2023) (Ikuta, J., concurring in the result). But as SB 25 (later enrolled as the Act) announces, it is intended to ensure "the free and fair elections in the state of Montana" by preventing the "spread" of "misinformation and disinformation."

However utopian an electoral season without misinformation would be, Montana cannot justify prescribing political orthodoxy—this is a timeless constitutional principle. *E.g., 281 Care Committee*, 766 F.3d at 786-87; *Kohls I*, 752 F. Supp. 3d at 1195-96. As Representative Cochran suggested, there's no qualitative difference between an AI-generated deepfake, and a real photograph

12

accompanying a "fake news" narrative.[4] Elections have always been a noisy ruckus of misinformation. Because the Act regulates political speech for a reason other than avoiding corruption, it is unconstitutional.

This is not to say that states have no valid interest in protecting the integrity and reliability of the electoral process. They do. *See, e.g., Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 204 (2008). But this generally valid interest in "free and fair elections" does not extend to political speech that does not affect the mechanics of the election. *Kohls I,* 752 F. Supp. 3d at 1195. One must contrast "lies about 'election procedures'"—an area where a "narrower restriction[] might pose fewer problems" with lies about election campaigns and government officials—areas that should be "categorically immune from liability." *See* Eugene Volokh, *When are Lies Constitutionally Protected*, 4 J. FREE SPEECH L. 685, 704-09 (2024). Put simply, the Act has no tailoring to its stated interest, let alone the narrow tailoring and least restrictive alternative that a content-based law requires under "demanding" strict scrutiny. *X Corp.*, 116 F.4th at 903; *see also IMDB.com*, 962 F.3d at 1125-27.

Montana knows how to pass constitutionally permissible laws that advance its interest in electoral integrity. *See* Mont. Code Ann. § 13-25-218

---

[4] Montana House State Administration Committee Hearing (Mar. 25, 2025), at 11:01:00, *available at* https://sg001-harmony.sliq.net/00309/Harmony/en/PowerBrowser/PowerBrowserV2/2025032 5/-1/53292.

(proscribing force, coercion, violence, or threats that interfere with a citizen's vote); *see generally United States v. Tan Duc Nguyen*, 673 F.3d 1259, 1264-66 (9th Cir. 2012) (upholding similar statutes from California). "We do not doubt that the State may prohibit messages intended to mislead voters about voting requirements and procedures. But that interest does not align with the State's construction of 'political' to refer to messages 'about the electoral choices at issue in [the] polling place.'" *Minn. Voters All. v. Mansky*, 585 U.S. 1, 18 n.4 (2018). Like the laws in *Kohls* and *Babylon Bee*, AB 2839 falls on the wrong side of that line, restricting political speech about candidates, campaigns and issues and "tamper[ing] with the right of citizens to choose who shall govern them." *Ted Cruz for Senate*, 596 U.S. at 305-06. "Directly regulating what is said or distributed during an election, as [the Act] does, goes beyond an attempt to control the process to enhance the fairness overall so as to carefully protect the right to vote." *281 Care Committee*, 766 F.3d at 787. "[W]hen these preservation goals" to protect the integrity of elections "are achieved at the expense of public discourse, they become problematic." *Id.* at 786.

"Free and fair elections" require "preserv[ing] an uninhibited marketplace of ideas in which truth will ultimately prevail,"[5] not closing it to content that the state deems too deceptive. It is exactly *for* the sake of free and fair elections, that we must live with "misinformation" about candidates and parties.

---

[5] *X Corp.*, 116 F.4th at 899 (quoting *McCullen v. Coakley*, 573 U.S. 464, 476 (2014)).

14

*281 Care Committee* faulted Minnesota's election-misinformation statute for lacking any "empirical evidence" of harm and instead relying on "common sense to establish that the use of false statements impacts voters' understanding, influences votes and ultimately changes elections." *Id.* at 790. So too here; during legislative debate, the bill's sponsor, Senator Ellis, admitted that she had "not heard of deepfakes being used in Montana."[6] Instead, Senator Ellis' concern was speculative: "people know it's coming and they want to regulate it." *Id.* at 16:49:28. The House sponsor was equally candid: "I think AI confuses everybody." Complaint ¶25. This prophylaxis doesn't suffice. *See, e.g., Alvarez*, 567 U.S. at 726-27. The government "must do more than simply posit the existence of the disease sought to be cured; it must instead point to record evidence or legislative findings demonstrating the need to address a special problem." *Ted Cruz for Senate*, 596 U.S. at 307.

As in California and Hawaii, there is no indication that the Montana legislature considered, let alone rejected, any of several less restrictive means of addressing the problem of political misinformation. *See Kohls II,* 797 F. Supp. 3d at 1187; *Babylon Bee*, 2026 WL 555552, at *13.

First, counterspeech. The First Amendment is built on the principle that the "remedy for speech that is false is speech that is true." *Alvarez*, 567 U.S. at 727.

---

[6] Montana Senate State Administration Committee Hearing (Jan. 22, 2025), at 16:48:29, *available at* https://sg001-harmony.sliq.net/00309/Harmony/en/PowerBrowser/PowerBrowserV2/2025012 2/-1/52551.

That principle has "special force" in the context of political campaigns. *Brown v. Hartlage*, 456 U.S. 45, 53 (1982). Thus, "courts have consistently erred on the side of permitting more political speech than less." *S.B.A. List*, 814 F.3d at 476. Montana cannot "enhance[] the ability of its citizenry to make wise decisions by restricting the flow of information to them." *281 Care Committee*, 766 F.3d at 786 (quoting *Eu v. San Francisco Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 228 (1989)). "When it comes to political expression, the antidote is not prematurely stifling content creation and singling out specific speakers but encouraging counter speech, rigorous fact-checking, and the uninhibited flow of democratic discourse." *Kohls II*, 797 F. Supp. 3d at 1191. As *Kohls* found, technology companies are already adopting scalable solutions to identify and label deepfakes "to educate citizens rather than relying on censorship." *Id.* at 1187. *See also Babylon Bee*, 2026 WL 555552, at *13 ("targeted counter speech appears to be a viable, less restrictive alternative [that] serves Hawaii's purpose and would not be overinclusive."). Although Montana's legislature received testimony from an informational expert who mentioned such tech company initiatives,[7] the legislature did not further discuss the possibility. Candidates themselves have every incentive to fact-check and rebut misinformation; this is bread-and-butter campaigning.

---

[7] Montana Senate State Administration Committee Hearing (Jan. 22, 2025), at 17:10:00, *available at* https://sg001-harmony.sliq.net/00309/Harmony/en/PowerBrowser/PowerBrowserV2/20250122/-1/52551.

Second, for truly egregious fakes that actually inflict reputational harm, longstanding tort law doctrines "such as privacy torts, copyright infringement, or defamation already provide recourse to public figures or private individuals whose reputations may be afflicted by artificially altered depictions…" *Kohls I*, 752 F. Supp. 3d at 1195-96. These regimes are generally applicable, they don't restrain speech *ex ante*, and they don't depend on the election-related content of the speech.

Third, Montana need not rely on private actors at all; for the last half century, it has criminalized using force, coercion, violence, restraint, undue influence or threats to interfere with another voter's exercise of the franchise. Mont. Code Ann. § 13-25-218. Such voter suppression laws are not only speech-neutral, they are well-established in every state in the Union.

Fourth, Montana has not considered public efforts to enhance digital and electoral literacy. *See Babylon Bee*, 2026 WL 555552, at *14 (finding such an educational campaign was a less restrictive alternative to a deepfake ban); *see generally NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1121 (9th Cir. 2024) (highlighting "educating children and parents on the importance of [technological] tools" as a less restrictive alternative). To the contrary, the Act is, perhaps unintentionally, adopting the worst possible civics lesson for citizens of this State: "believe any political ad you see." "[S]uppression of speech by government can make exposure of falsity more difficult, not less so." *Alvarez*, 567 U.S. at 728.

17

Worse still, the Act "perpetuate[s] the very fraud it is allegedly designed to prohibit." *281 Care Committee*, 766 F.3d at 789. It not only allows the Attorney General and other state officials to bring complaints, it allows speakers' political adversaries to do so. "Complaints can be filed at a tactically calculated time so as to divert the attention of an entire campaign" and inflict maximum "political damage." *Id.* at 790. The filing of a complaint itself inflicts the damage. *Id.* at 792; *see also S.B.A. List*, 814 F.3d at 474 ("there is a real risk of complaints from…political opponents."); *Kohls II*, 797 F. Supp. 3d at 1184 (finding "real risk of malicious lawsuits that could chill protected speech").

Under the Act, candidates may use AI-generated content to *boost* their own reputation. Permitting such deepfakes is fundamentally antithetical to the Act's claimed objective of combatting misinformation for "free and fair elections." AI-deepfakes for me, but not for thee. This type of arbitrary, underinclusive, even counterproductive line drawing is unconstitutional. *Grimmett v. Freeman*, 59 F.4th 689, 694-96 (4th Cir. 2023) (following *R.A.V.*). If the real impetus behind the bill was enabling incumbent legislators to "defend [their] honor" as Representative Kortum announced in committee,[8] then the permission for laudatory deepfakes makes far more sense. Of course, the government has no legitimate interest in

---

[8] *See* Complaint ¶8, quoting Montana House State Administration Committee Hearing (Apr. 3, 2025) at 11:16:16, *available at* https://sg001-harmony.sliq.net/00309/Harmony/en/PowerBrowser/PowerBrowserV2/20250403/-1/53299#agenda_.

insulating itself from criticism, *e.g. Houston Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 478 (2022), so the Act would be unconstitutional for that reason instead.

Other speakers are also privileged under the Act—members of the media and those who are not working in an official election capacity. The First Amendment is "deeply skeptical of laws that 'distinguish among different speakers, allowing speech by some but not others.'" *Nat'l Inst. of Family and Life Advocates v. Becerra*, 585 U.S 755, 777-78 (2018) (quoting *Citizens United*, 558 U.S. at 340); *Kohls II*, 797 F. Supp. 3d at 1183-84. The Act's speaker discrimination is further evidence of its underinclusiveness and thus lack of tailoring.

The Act is fundamentally incompatible with the First Amendment. As a viewpoint-based restriction of protected speech, it is automatically infirm. Interpreted as a subject matter/content-based restriction, it is fatally untailored. "[T]he best test of truth is the power of the thought to get itself accepted in the competition of the market, and the people lose when the government is deciding which ideas should prevail." *NIFLA*, 585 U.S. at 772 (internal quotation omitted). "The very purpose of the First Amendment is to foreclose public authority from assuming a guardianship of the public mind through regulating the press, speech, and religion." *Thomas v. Collins*, 323 U.S. 516, 545 (1945) (Jackson, J., concurring).

### C.     The Act compels speech.

Defendants may argue that the Act doesn't actually prohibit political deepfakes, it simply requires a disclaimer stating that "This _____ (image/audio/video/multimedia) has been significantly edited…and depicts

19

speech or conduct that falsely appears to be authentic or truthful." § 13-35-802(1)(b).

The problem is that the disclaimer requirement itself violates the First Amendment by unconstitutionally compelling speech. *See, e.g.*, *NIFLA*, 585 U.S. 755. As a regulation of political speech, it is not subject to the lessened standard for a commercial speech labeling requirement. *See X Corp.*, 116 F.4th at 900-03. Again, it fails strict scrutiny.

Even if it were subject to a lower standard, the Act could not meet its "burden to prove that the…notice is neither unjustified nor unduly burdensome." *NIFLA*, 585 U.S. at 776. As discussed above, the Act's justification is "broad[ly] prophylactic" and "purely hypothetical." *Id.* Worse, the specific requirements of the disclaimer "effectively rule[] out the possibility of [certain communications] in the first place." *Id.* at 778 (internal quotation omitted); *accord Am. Bev. Ass'n*, 916 F.3d at 757 (determining that the labeling requirement occupying 20% of advertisement was "unjustified or unduly burdensome"). For example, the Act requires any video contain the disclaimer "throughout the communication." For a short radio ad, the compelled 8 second disclaimer could consume more than half the air time. It would fully "drown out" the message. *NIFLA*, 585 U.S. at 787. (internal quotation omitted).

In short, the Act sets forth unforgiving, unjustified labeling requirements on political speech. Just as states cannot require comedians to preface every joke with a caveat or teachers to preface every sensitive subject with a trigger warning,

20

Montana cannot oblige speakers like Bartel to annotate their political symbolism. It would "impermissibly alter the content, intended effect, and message of their speech." *Babylon Bee*, 2026 WL 555552, at \*11. It would "dilute[] their message." *Kohls I*, 752 F. Supp. 3d at 1197. And, for Bartel's speech, it would give the false impression that his accurate information about the candidates' voting records is not "authentic or truthful." Montana cannot "require speakers to affirm in one breath that which they deny in the next." *Pacific Gas & Elec. Co. v. Pub. Utilities Comm'n.*, 475 U.S. 1, 16 (1986). The Act unconstitutionally compels speech.

### D.     The vague Act admits of arbitrary enforcement.

A law is facially void-for-vagueness when it either (1) fails to give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, or (2) fails to cabin enforcement discretion to avoid the possibility of arbitrary or discriminatory enforcement. *FCC v. Fox Television*, 567 U.S. 239, 253-54 (2012). While springing from the Due Process Clause, these requirements "are more acute when a law implicates First Amendment rights" because of the risks of chilled speech and discriminatory enforcement. *Butcher*, 38 F.4th at 1169. "These concerns are magnified even further when a law regulates political speech." *Id.*

The Act's vagueness starts with its core definition of "Deepfake": content that "appears to a reasonable person to depict an individual saying or doing something that did not occur in reality" or "provides a reasonable person a fundamentally different understanding or impression" than they would get from

21

the unaltered media. § 13-35-801(3)(a)-(b). What appears realistic to one reasonable person is not realistic to another. What gives a fundamentally different understanding or impression to one reasonable person does not to another. As matters of artistic sensibility, these inquiries are "inherently subjective" and therefore unconstitutionally vague. *City of Chicago v. Morales*, 527 U.S. 41, 62-64 (1999); *Butcher*, 38 F.4th at 1175. For example, examining regulations that set standards for certification of international educational materials, the Ninth Circuit found that requiring the material to be "representative," "authentic," and "accurate" was "unquestionably vague." *Bullfrog Films, Inc. v. Wick*, 847 F.2d 502, 513 (1988). Likewise, the Act's standards "are too subjective and vague because they inherently rely on value judgments" of the viewers "encountering the manipulated content." *Kohls II*, 797 F. Supp. 3d at 1190.

Similar vagueness lies in what constitutes "minimally edited" content "that does not materially alter the meaning or significance that a reasonable person understands." § 13-35-801(1)(b). There exists "'no principle for determining when' speech will 'pass from the safe harbor…to the forbidden.'" *Kohls II*, 797 F. Supp. 3d at 1190 (quoting *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1049 (1991)); *see also Sackett v. EPA*, 598 U.S. 651, 681 (2023) ("the boundary between a 'significant' and an insignificant nexus is far from clear"); *Butcher*, 38 F.4th at 1178 (finding unconstitutionally vague a statute that exempted "*de minimis*" political expenditures). Indeed, an investigator for the Commissioner's office testified

22

before the legislature that the office would likely need to retain outside experts to decipher whether disputed communications were AI-generated. Complaint ¶24.

So too for the satire/parody safe harbor. "[R]easonable people still might not agree whether you're looking at fake news, hyper-partisan news, satire, or some other form of misinformation." Carl T. Bergstrom & Jevin D. West, CALLING BULLSHIT, THE ART OF SKEPTICISM IN A DATA-DRIVEN WORLD 192 (2020). "[O]ne man's vulgarity is another man's lyric," *Cohen v. California*, 403 U.S. 15, 25 (1971). "What is contemptuous to one man may be a work of art to another." *Smith v. Goguen*, 415 U.S. 566, 573 (1974). Ultimately, the satire carveout "simply exchanges [some] overbreadth for [more] vagueness." *Zarate v. Younglove*, 86 F.R.D. 80, 104 (C.D. Cal. 1980)

Equally damning is the Act's attempt to police the line between a speaker's "intent to injure the reputation of the candidate or party or otherwise deceive a voter" and simply intending to persuade someone politically or providing information about voting records to highlight a perceived flaw. Bartel's mailers were not intended to deceive listeners into thinking the subject candidates had trotted out pronoun pins and pride flags to pose for photos; the intent was commenting on their voting records. Bartel Decl. ¶ 9. But, judging from their administrative complaints, those candidates saw it differently. The line is "nebulous and intangible at best." *Kohls II*, 797 F. Supp. 3d at 1190.

These provisions all present classic terms of degree that "vest[] virtually complete discretion in the hands of" those who bring suit against speakers,

23

whether it be an enforcement official like Defendant or a third party political opponent seeking injunctive or equitable relief. *Kolender v. Lawson*, 461 U.S. 352, 358 (1983). Nor is it even clear what speakers the law covers. It includes speakers "working in an official election capacity, " Mont. Code Ann. § 13-35-802(1)(a)) without defining that phrase, but then carves out newsmedia, Mont. Code Ann. § 13-35-802(2)(a)), suggesting that outside reporters would otherwise be included.

Such "[a]n indeterminate prohibition carries with it the opportunity for abuse." *Minn. Voters All.*, 585 U.S. at 21 (simplified). Because the Act fails to guide enforcement officials with "objective, workable standards," it is void for vagueness. *Id.*

## II.    Plaintiffs face irreparable harm.

"[T]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Klein v. City of San Clemente*, 584 F.3d 1196, 1207–08 (9th Cir. 2009) (internal quotation omitted; citing cases). "[A]ny First Amendment infringement that occurs with each passing day is irreparable." *Neb. Press Ass'n v. Stuart*, 423 U.S. 1327, 1329 (1975).

Here, the Act chills Plaintiffs from engaging in certain political speech; specifically they wish to sponsor political mailers that use AI-generated material in connection with the November 2026 general election. *See* Bartel Decl. ¶ 18 & Ex. 1. That chill is objectively reasonable given the vague text of the Act and the fact that Plaintiffs have already been subject to multiple complaints of violation for their past mailers. *See* Complaint ¶¶ 46-54; *see also Susan B. Anthony List v. Driehaus*,

24

573 U.S. 149, 164 (2014) (past complaints provide "good evidence" of risk of future enforcement). If the statute's enforcement is not enjoined before the next election enforcement period opens in September, Plaintiffs will be chilled in the exercise of their First Amendment rights. Even if the Defendants wield their powers responsibly, Bartel and other speakers will be deterred by the statute's vague standards and the fact that any political opponent can register a disciplinary complaint. That chill "constitutes irreparable harm." *Cuviello v. City of Vallejo*, 944 F.3d 816, 833 (9th Cir. 2019).

Because Bartel has above established "[a] colorable First Amendment claim" he has also established "irreparable injury sufficient to merit the grant of relief." *Am. Bev. Ass'n*, 916 F.3d at 758 (internal quotation omitted).[9]

### III. The balance of equities and public interest also support granting preliminary relief.

The remaining two factors to be considered—the public interest and balance of equities—weigh in favor of granting relief. Because the Act not only deters Plaintiffs' speech but the political speech of all Montanans, "the balance of equities and the public interest thus tip sharply in favor of enjoining the [law]."

---

[9] Because the summary judgment process might overtake this timetable, this preliminary injunction is necessary to prevent the constitutional harm beginning when the Act again becomes operative for the 2026 general election. *See generally* 11A Wright & Miller, FEDERAL PRACTICE AND PROCEDURE § 2948.1 ("If a trial on the merits can be conducted before the injury would occur there is no need for interlocutory relief.").

*Klein*, 584 F.3d at 1208. "[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (internal quotations omitted).

Conversely, as discussed above, *supra* §I.B, Montana lacks a valid interest in regulating political speech about candidates to ensure "free and fair elections," however noble a cause that may be. Separately, if Montana is truly that concerned about Plaintiffs' mailers and others like them delegitimizing elections, then the antidote to that is the truth. "The response to the unreasoned is the rational; to the uninformed, the enlightened; to the straight-out lie, the simple truth." *Alvarez*, 567 U.S. at 727. That speech can be the government's own, delivered through, for example, a "public-information campaign." *NIFLA*, 585 U.S. at 775. Montana may promote its own content that points out such deepfakes; it might author a "community note" on X, for example, which provides the public with important user-generated comments that add context to tweets. But the government may not "co-opt" private parties to act as the mouthpiece of the government's preferred message. *Id.* "If there be a time to expose through discussion the falsehood and fallacies, to avert the evil by the processes of education, the remedy to be applied is more speech, not enforced silence." *Whitney v. California*, 274 U.S. 357, 377 (1927) (Brandeis, J., concurring).[10]

---

[10] A Fed. R. Civ. P. 65(c) bond is not required here because this is a public-interest case seeking only declaratory and injunctive relief and there is no risk of monetary loss to the defendants. *See* 11A Charles Alan Wright, et al., FEDERAL PRACTICE AND PROCEDURE § 2954 n.13 (3d ed. 2020) (collecting cases); *Jorgensen v.*

## CONCLUSION

For these reasons, the Court should grant Plaintiffs' motion for a preliminary injunction.

Dated: July 17, 2026

/s/ Matthew G. Monforton
Matthew G. Monforton (Montana Bar # 5245)
Monforton Law Offices, PLLC
32 Kelly Court
Bozeman, Montana 59718
Phone: (406) 570-2949
Email: matthewmonforton@yahoo.com

Adam E. Schulman (DC Bar No. 1001606*)
HAMILTON LINCOLN LAW INSTITUTE
1629 K Street, NW Suite 300
Washington, DC 20006
Phone: (610) 457-0856
Email: adam.schulman@hlli.org
* *admitted pro hac vice*

*Attorneys for Plaintiffs Accountability in State Government and Dan Bartel*

---

*Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003); *Alario v. Knudsen*, 704 F. Supp. 3d 1061, 1088 n.6 (D. Mont. 2023).

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Local Civil Rule 7.1(d) because this brief is 6491 words long, excluding the caption, tables of contents and authorities, signature blocks, and certificates.

Dated: July 17, 2026

/s/ Matthew Monforton

## CERTIFICATE OF SERVICE

I hereby certify that on this 17th day of June, 2026, a true and correct copy of the foregoing was electronically filed with the Clerk of the Court using CM/ECF system.

/s/ Matthew Monforton