IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
HELENA DIVISION

| | |
|---|---|
| ACCOUNTABILITY IN STATE GOVERNMENT, a Montana independent political committee; DAN BARTEL,<br><br>Plaintiffs,<br><br>vs.<br><br>AUSTIN KNUDSEN, in his official capacity as Montana Attorney General; KEVIN DOWNS, in his official capacity as Lewis and Clark County Attorney; CHRIS GALLUS, in his official capacity as Montana Commissioner of Political Practices,<br><br>Defendants. | CV 26-38-H-SPW<br><br>ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION |

Before the Court is Plaintiffs Accountability in State Government and Dan Bartel's Motion for a Preliminary Injunction. (Doc. 6). Plaintiffs seek an order preliminarily enjoining Defendants Austin Knudsen, Kevin Downs, and Chris Gallus, in their official capacities, from reviewing, investigating, prosecuting, adjudicating, or enforcing violations of Senate Bill 25, codified at Montana Code Annotated §§ 13-35-801–13-35-804 (2025). (*See* Docs. 6–7). The Court held a hearing on the Motion on August 21, 2026. (Doc. 29).

For the reasons set forth below, the Court grants Plaintiffs' Motion.

## I. Background

In 2025, the Montana Legislature passed Senate Bill 25 (the Bill"), to regulate "the use of deepfakes in election communications and electioneering communications." S.B. 25, 69th Leg., Reg. Sess. (Mont. 2025). The Bill sought to target the rapid rise of generative artificial intelligence ("AI") posing "a threat to free and fair elections in the State of Montana." *Id.* Lawmakers specifically sought to restrict deepfake content that "falsely depict[s] a candidate's speech or action in order to spread misinformation," comparing such depictions to "forcing a person to say or do something in a video recorded under threat." *Id.* The Bill's drafters found that these fabrications "may exist indefinitely once posted on the Internet," risking permanent damage to a political figure's reputation and safety, and leaving a voter's opinion "irreparably tainted." *Id.*

After passage, the Bill was codified at Montana Code Annotated §§ 13-35-801–13-35-804 (the "Act"). As intended, the Act regulates any person or entity "working in an official election capacity," prohibiting them from "pay[ing] for or sponsor[ing] the production, creation, or distribution" of "deepfakes" within 60 days of the start of election voting. Mont. Code Ann. § 13-35-802(1)(a).

The Act defines "deepfake" as "AI-generated content or synthetic media that depicts a candidate or political party with the intent to injure the reputation of the candidate or party or otherwise deceive a voter." *Id.* § 13-35-801(3). To fall within

the Act's scope, the media must either "appear[] to a reasonable person to depict an individual saying or doing something that did not occur in reality," or "provide[] a reasonable person a fundamentally different understanding or impression of the appearance, action, or speech than a reasonable person would have from the unaltered, original version of the image, audio recording, or video recording." *Id.* § 13-35-801(3)(a)–(b).

Moreover, the Act clarifies that AI-generated content only encompasses material that is "substantially created or modified by generative [AI] in a manner that materially alters the meaning or significance that a reasonable person understands from the content." *Id.* § 13-35-801(1)(a). The definition excludes "content that is [only] minimally edited, adjusted, or enhanced by generative [AI]." *Id.* § 13-35-801(1)(b).

The Act provides a safe-harbor exemption from liability if the regulated person or entity includes a prominent disclosure (the "Disclosure") stating: "This [image/audio/video/multimedia] has been significantly edited by artificial intelligence and depicts speech or conduct that falsely appears to be authentic or truthful." *Id.* § 13-35-802(1)(b). To qualify for this exemption, the communication must meet strict formatting standards, including specific font sizes, picture heights, readability metrics, and audio lengths. *Id.* § 13-35-802(1)(c)(i)–(iv).

Separately, the Act carves out exemptions for several categories of content, speakers, and platforms. It protects media and communication infrastructure by permitting radio or television stations to broadcast deepfakes as part of newscasts or paid advertisements. *Id.* § 13-35-802(2)(a)–(b). The Act also explicitly exempts deepfakes that constitute satire or parody, though it leaves both categories undefined. *Id.* § 13-35-802(2)(c).

To enforce these prohibitions, the Act establishes civil remedies and a three-tiered criminal enforcement structure. *Id.* §§ 13-35-803–13-35-804. Candidates or political parties "aggrieved by a violation" may sue for injunctive relief. *Id.* § 13-35-803(1). In addition to injunctive relief, Plaintiffs can recover actual damages, up to $10,000 in punitive damages, litigation costs, and attorney fees. *Id.* § 13-35-803(3)–(4). Upon a showing of ongoing harm, district courts must expedite these actions over all other pending matters. *Id.* § 13-35-803(2).

As for criminal penalties, complaints are filed with the Commissioner of Political Practices (the "Commissioner"). *Id.* § 13-35-804(1). Enforcement escalates based on prior findings. A first sufficiency finding triggers civil penalties imposed by the Commissioner or county attorney. *Id.* "A second sufficiency finding by the [C]ommissioner must be referred to the county attorney for misdemeanor prosecution." *Id.* § 13-35-804(2). "A third sufficiency finding . . . must be referred to the attorney general or county attorney for felony prosecution." *Id.* § 13-35-

804(3). Criminal prosecution does not bar parallel civil or injunctive lawsuits for violations of the Act. *Id.* § 13-35-804(4)–(5).

Plaintiffs in the present case are Dan Bartel, a former state legislator, and his political committee, Accountability in State Government. (Doc. 1 at 6). They distribute mailers analyzing the legislative records of candidates. (*Id.* at 1). While these mailers feature authentic photographs, they also integrate realistic, AI-generated imagery. (*Id.* at 1–2). Recent examples include: two mailers depicting candidates wearing preferred-pronoun pins and holding pride flags, and a third mailer showing a candidate holding a gas pump nozzle that is spraying ten-dollar bills, with a pump price reading "Arm" and "Leg." (Doc. 1-1 at 3–4; Doc. 1-3 at 3–4; Doc. 1-5 at 3–4).

Two of the targeted candidates and another legislator filed administrative complaints against Plaintiffs. (Doc. 1-1 at 1–2; Doc. 1-3 at 1–2; Doc. 1-5 at 1–2). Montana's current Commissioner, Christopher Gallus, notified Plaintiffs that the complaints met basic screening requirements, detailed the statutory penalties, and ordered a response. (Docs. 1-2, 1-4, 1-6). Plaintiffs received several extensions and formally responded on August 10, 2026. (Doc. 28 at 2–3).

On August 20, 2026—the day before the scheduled preliminary injunction hearing—Defendants filed a Declaration by Commissioner Gallus. (*Id.* at 1–6). In it, Gallus confirmed receipt of the three complaints but stated: "I do find dismissal

at this stage appropriate because further factual development is not necessary to determine that the election materials provided fall under the [Act's] exemption for satire or parody." (*Id.* at 4). He indicated that an official dismissal of all three complaints was "forthcoming." (*Id.* at 5).

Despite the promised administrative dismissal, Plaintiffs intend to sponsor political advertisements for the upcoming general election on November 3, 2026, that risk violating the Act. (Doc. 8 at 7). They contend that the specter of future complaints and escalating criminal liability creates a constitutional chill on their speech. (*Id.* at 8). Accordingly, Plaintiffs seek a court order enjoining the enforcement of the Act by Defendants. (Doc. 7 at 10).

## II. Legal Standard

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). In evaluating these factors, courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Id.* at 24 (citation omitted).

Because a preliminary injunction or TRO is an "extraordinary remedy," it is never awarded as a matter of right, but only "upon a clear showing that the plaintiff

is entitled to such relief." *Id.* at 22. Further, preliminary relief is not an adjudication on the merits; rather, it is a tool to preserve the status quo and prevent the irreparable loss of rights before a final judgment. *Textile Unlimited, Inc. v. A..BMH & Co.*, 240 F.3d 781, 786 (9th Cir. 2001).

## III. Discussion

The Court first addresses Defendants' challenge to Plaintiffs' standing before evaluating the mootness concerns raised during oral argument. Next, the Court analyzes the merits of Plaintiffs' request for a preliminary injunction. Finally, the Court turns to the appropriate scope of relief.

### *A. Standing*

As a preliminary matter, the Court addresses Defendants' threshold challenge to Plaintiffs' standing. Challenges to standing may be raised at any time prior to final judgment, and the Court is obligated to address the issue *sua sponte*. *Ctr. for Biological Diversity v. Kempthorne*, 588 F.3d 701, 707 (9th Cir. 2009).

To establish standing, a plaintiff must demonstrate three elements: (1) an injury to a legally protected interest that is concrete, particularized, and actual or imminent; (2) a causal connection between the injury and the defendant's conduct; and (3) a likelihood that judicial relief will redress the injury. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). The plaintiff bears the burden of establishing these elements. *WildEarth Guardians v. U.S. Dep't of Agric.*, 795 F.3d 1148, 1154

(9th Cir. 2015). However, the United States Supreme Court has "altered its traditional rules of standing" for First Amendment overbreadth challenges. *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973). Where a plaintiff brings a pre-enforcement challenge under the First Amendment, these "unique standing considerations tilt dramatically toward a finding of standing" to avoid chilling protected expression. *Planned Parenthood Great Nw., Haw., Alaska, Ind., Ky. v. Labrador*, 122 F.4th 825, 836 (9th Cir. 2024) (citation modified); *see also Imperial Sovereign Ct. of Mont. v. Knudsen*, 170 F.4th 820, 834 (9th Cir. 2026) (courts apply standing and ripeness requirements "less stringently" in First Amendment context).

In this context, a "[p]re-enforcement injury is a special subset of injury-in-fact, where 'the injury is the anticipated enforcement of the challenged statute in the future.'" *Planned Parenthood*, 122 F.4th at 836 (quoting *Peace Ranch, LLC v. Bonta*, 93 F.4th 482, 487 (9th Cir. 2024)). Often, this injury manifests as self-censorship, which is a "constitutionally recognized injury." *Ariz. Right to Life Pol. Action Comm. v. Bayless*, 320 F.3d 1002, 1006 (9th Cir. 2003); *Wolfson v. Brammer*, 616 F.3d 1045, 1059 (9th Cir. 2010). Accordingly, a pre-enforcement plaintiff satisfies "constitutional standing requirements by demonstrating a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement." *Lopez v. Candaele*, 630 F.3d 775, 785 (9th Cir. 2010) (citation modified). Under this framework, "an actual arrest, prosecution, or other enforcement action is not a

prerequisite to challenging the law." *Susan B. Anthony List v. Driehaus (SBA List)*, 573 U.S. 149, 158 (2014). Instead, a plaintiff demonstrates an injury-in-fact by showing: "[1] an intention to engage in a course of conduct arguably affected with a constitutional interest, but [2] proscribed by a statute, and [3] there exists a credible threat of prosecution thereunder." *Id.* at 159.

Nevertheless, a plaintiff "must still show an actual or imminent injury." *Candaele*, 630 F.3d at 785. Where the "plain language" of a challenged rule does not apply to a plaintiff's speech, that "inapplicability weighs against both the plaintiffs' claims that they intend to violate the law, and also their claims that the government intends to enforce the law against them." *Id.* at 788.

Here, Defendants do not contest that Plaintiffs intend to engage in protected political speech, satisfying the first element of the *SBA List* framework. Instead, Defendants challenge the remaining two factors, arguing that Plaintiffs' mailers are not "proscribed by" the Act and that no "credible threat of enforcement" exists. (*See* Doc. 14 at 15–21). The Court reviews each argument in turn and concludes that Plaintiffs have established standing to proceed.

*1. Arguably Proscribed By*

To satisfy the second element of the *SBA List* framework, "[a] plaintiff must only show that their future conduct is *arguably proscribed* by the statute it wishes to challenge." *Am. Encore v. Fontes*, 152 F.4th 1097, 1116 (9th Cir. 2025) (emphasis

added) (citation modified). In evaluating pre-enforcement standing, a court must accept a plaintiff's statutory interpretation "so long as it is an arguable interpretation." *Id.* The *SBA List* standard does not require conduct to be "certainly," "definitely," or even decisively proscribed. *See SBA List*, 573 U.S. at 162. Furthermore, plaintiffs need not "admit to violating a law in order to have standing to challenge it." *Arizona v. Yellen*, 34 F.4th 841, 849 (9th Cir. 2022).

Defendants contend that Plaintiffs cannot meet this threshold because their conduct is not arguably prescribed by the Act. Specifically, Defendants argue that "Plaintiffs' mailers do not fall within [the Act's] definition of 'deepfake.'" (Doc. 14 at 16). Under the Act, a deepfake requires AI-generated media to "realistically depict, to a reasonable person, a candidate doing or saying something they did not say or do." (*Id.* (paraphrasing Mont. Code Ann. § 13-35-801(3)). Highlighting the mailers featuring Representative Llew Jones holding a gas pump that pours out ten-dollar bills with prices reading "Arm" and "Leg," Defendants assert this imagery is a visual metaphor rather than a realistic depiction. (*Id.* at 17). Because a reasonable person would immediately recognize the mailers as political caricature, Defendants argue the conduct fits squarely within the Act's exemption for "satire or parody." (*Id.* at 18–21).

Plaintiffs counter that while Defendants now characterize the mailers as clear satire, multiple sitting members of the Montana Legislature—who lodged formal

complaints against Plaintiffs—evidently disagreed. (Doc. 16 at 6). Plaintiffs further point to Bartel's Declaration, which notes that the Act is vague and unclear due its reliance on highly subjective terms like "reasonable person," "minimally edited," "satire/parody," and "deepfake." (Doc. 8 at 5–6). Consequently, despite Defendants' assurances that past mailers were permitted, Plaintiffs maintain they cannot speak freely in the future without fear of enforcement. (*Id.* at 8).

The Court agrees with Plaintiffs that their conduct is arguably proscribed by the Act. Put simply, the Act defines "deepfake" as: (1) AI-generated content, (2) depicting a candidate, (3) with the intent to injure the candidate's reputation or deceive a voter. Mont. Code Ann. § 13-35-801(3). The content must appear to a reasonable person to depict an event that did not occur, or alter media to create a fundamentally different understanding of the candidate's actual speech or conduct. *Id.* § 13-35-801(3)(a)–(b).

Here, Plaintiffs generate AI-altered media depicting political candidates in an unflattering light to inform voters of those candidates' legislative records. (*See* Doc. 1 at 11–15). While Defendants emphasize Plaintiffs' own contention that no reasonable person would mistake these mailers for objective reality (Doc. 14 at 17 (citing Doc. 1 at 14–15)), whether a reasonable person might derive a fundamentally altered understanding of the candidate's conduct remains an arguable question. For example, a reasonable person could plausibly view the AI-generated images of

Representatives Jennifer Carlson and Eric Albus wearing pronoun pins and holding pride flags and believe those images to be authentic.

Moreover, although Defendants point to extreme examples to illustrate the Act's boundaries—such as a deepfake robocall realistically mimicking President Biden or clear-cut instances of parody (*id.* at 6)—the Court gives little weight to these contentions. Reasonable minds can, and do, differ regarding what the Act covers. Forcing a speaker to rely on the government's post-hoc, case-by-case explanations of subjective exceptions creates a system of administrative screening that is incompatible with the First Amendment. In this case, while Commissioner Gallus now asserts that the initial mailers constituted permissible satire (Doc. 28 at 4), the lack of clear statutory definitions of "satire" and "parody" leaves Plaintiffs with a valid, constitutionally cognizable fear that their future speech will fall on the wrong side of the line.

Because the standing inquiry looks to whether conduct is *arguably* proscribed rather than *actually* proscribed, and because Plaintiffs' mailers do not definitively fall outside the text of the Act, Plaintiffs have satisfied the second element of the pre-enforcement standing framework.

*2. Threat of Prosecution*

In evaluating whether the final element of the *SBA List* framework is met, courts consider "whether [the plaintiff] ha[s] adduced enough evidence to show that

there is a realistic threat that the law in question may be enforced against them." *Fontes*, 152 F.4th at 1118. Notably, "administrative action, like arrest or prosecution, may give rise to harm sufficient to justify pre-enforcement review." *SBA List*, 573 U.S. at 165. When measuring this harm, courts consider "the threat posed *collectively* by the entire 'universe of potential complainants.'" *Matsumoto v. Labrador*, 122 F.4th 787, 798 (9th Cir. 2024) (citing *SBA List*, 573 U.S. at 164).

To assess the reasonableness of a plaintiff's fear of prosecution, the Ninth Circuit weighs three primary factors: "(1) whether the enforcement authorities have communicated a specific warning or threat to initiate proceedings; (2) whether the enforcing authority has disavowed enforcement; and (3) whether there is a history of past prosecution or enforcement." *Fontes*, 152 F.4th at 1118 (citation modified). Furthermore, a plaintiff's evidentiary burden is lower when constitutional speech is at stake. "[I]n the context of pre-enforcement challenges to laws on First Amendment grounds, a plaintiff need only demonstrate that a threat of potential enforcement will cause him to self-censor." *Tingley v. Ferguson*, 47 F.4th 1055, 1068 (9th Cir. 2022), *abrogated in part on other grounds by*, *Chiles v. Salazar*, 606 U.S. 627 (2026) (citation modified).

Here, Plaintiffs have provided sufficient evidence to establish a realistic threat of enforcement. As Plaintiffs argue, a credible threat of enforcement exists "in the form of the multiple private complaints, the warning letter from Commissioner

Gallus, and the lack of government disavowal." (Doc. 16 at 6 (internal citation omitted)). Defendants respond that unprosecuted administrative complaints cannot constitute a credible threat of prosecution (Doc. 14 at 20), but *SBA List* confirms that facing administrative action short of formal prosecution can still establish Article III injury. 573 U.S. at 165.

Furthermore, the application of the Ninth Circuit's three-factor test strongly supports standing. First, a specific warning or threat has been communicated. Before Plaintiffs filed this lawsuit, Commissioner Gallus—the preliminary enforcement authority under the Act—sent letters to Plaintiffs stating that complaints had been filed against them "alleg[ing] specific violations of Montana election law" and that the Commissioner's review marked the beginning of the legal process. (Doc. 1-2 at 1; Doc. 1-4 at 1; Doc. 1-6 at 1). The correspondence explained that "[i]f violations are found to have occurred and prosecution is determined to be justified, this matter will be referred to the local county attorney," who would then decide whether to prosecute or refer the matter back. (*Id.*). The letters also warned of potential penalties that could be imposed under the Act. (Doc. 1-2 at 1–2; Doc. 1-4 at 1–2; Doc. 1-6 at 1–2).

The Court agrees with Plaintiffs that these letters "initiat[ed] the legal process" against them, easily satisfying the threshold for "specific warning[s] or threat[s] to initiate proceedings." (*See* Doc. 1-2 at 1; Doc. 1-4 at 1; Doc. 1-6 at 1);

*see also Fontes*, 152 F.4th at 1118. Moreover, based on these threats of enforcement, Plaintiffs have adequately "alleged that the law has chilled [their] speech and that [they] ha[ve] self-censored [themselves] out of fear of enforcement." *Tingley*, 47 F.4th at 1068; (*see* Doc. 8 at 7–8). Defendants' affirmative "warning[s] of enforcement" combined with Plaintiffs' "self-censorship in the face of the [Act]" are sufficient to satisfy the first factor. *See Tingley*, 47 F.4th at 1068.

Second, the government has failed to disavow enforcement. Although Commissioner Gallus later stated that the three active complaints against Plaintiffs would be dismissed (Doc. 28 at 5), this promised dismissal does not amount to a disavowal of the Act. At the hearing, Commissioner Gallus indicated that his standard practice is to issue formal response requests for any complaint meeting minimum screening requirements. Consequently, even if his office dismisses the historical complaints, any future complaints filed against Plaintiffs will trigger a compulsory legal process. Because Defendants have not renounced future enforcement against Plaintiffs—and instead intend to continue applying the Act to similarly situated speakers—the threat remains.

In *Matsumoto*, the government tried to "downplay[] the extent of the attorney general's enforcement authority," but it "never disavowed his authority," nor did it "attempt[] to prevent county attorneys from enforcing the statute." 122 F.4th at 798 (citation modified). The same is true here. Defendants are doing "[q]uite the

opposite" of disavowing enforcement by "vigorously defending the constitutionality of the statute and its broad coverage." *See id.* While Defendants point to the "multiple layers of discretionary action [that] precede criminal liability" to suggest that enforcement authority is cabined (*see* Doc. 14 at 20), their active defense of the Act underscores the credibility of the threat. This threat is further amplified because any private individual can file a complaint, creating an unlimited "universe of potential complainants" that political adversaries can exploit to suppress speech. *See SBA List*, 573 U.S. at 164. Accordingly, the second factor is met.

Third, the lack of past enforcement is not determinative. An absence of enforcement history is given "'little weight' when the challenged law is 'relatively new and the record contains little information as to enforcement.'" *Cal. Trucking Ass'n v. Bonta*, 996 F.3d 644, 653 (9th Cir. 2021) (quoting *Wolfson*, 616 F.3d at 1060). In such cases, "either a general warning of enforcement or a failure to *disavow* enforcement is sufficient to establish a credible threat of prosecution." *Matsumoto*, 122 F.4th at 797 (citation modified). Because the Act is new and the record lacks a historical enforcement baseline, this factor is neutral. However, the existing warnings and the lack of government disavowal are enough to support standing.

In sum, "the prospect of future enforcement is far from imaginary or speculative." *See SBA List*, 573 U.S. at 165 (citation modified). The administrative

burdens, the lack of a limiting principle on the universe of potential complainants, and Defendants' active defense of the Act collectively create an objective, credible threat of prosecution that satisfies Article III standing requirements.

*B. Mootness*

In their response brief, Defendants contend that Plaintiffs' conduct falls outside the scope of the Act, depriving them of standing. Consistent with this position, on the eve of the Court's hearing on the Motion, Defendants filed a Declaration by Commissioner Gallus indicating his intent to dismiss the administrative complaints pending against Plaintiffs. At the hearing, the Court granted the parties an opportunity to address the impact of this Declaration on the need for a preliminary injunction.

While the Court has already concluded that Plaintiffs retain standing, Plaintiffs raised the alternative issue of whether the Declaration renders this action moot. The Court addresses that question here.

"Standing is determined by the facts that exist at the time the complaint is filed," whereas mootness requires an inquiry into "changing circumstances that arise after the complaint is filed." *Clark v. City of Lakewood*, 259 F.3d 996, 1006 (9th Cir. 2001). An action becomes moot—and therefore presents no justiciable case or controversy—only "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *City of Erie v. Pap's A.M.*, 529 U.S.

277, 287 (2000) (quoting *County of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979)). The central question is whether the Court can still grant any effective relief. *Chafin v. Chafin*, 568 U.S. 165, 172 (2013). "As long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot." *Id.* (citation omitted).

It is well settled that the "voluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case, i.e., does not make the case moot." *United States v. W. T. Grant Co.*, 345 U.S. 629, 632 (1953). Because a defendant remains free to return to their old ways, a case is mooted only if the defendant carries "[t]he heavy burden of persuading the court that the challenged conduct cannot reasonably be expected to start up again." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC)*, 528 U.S. 167, 189 (2000) (citation modified). "The voluntary cessation doctrine's heavy burden would hardly be a burden at all if the [g]overnment could overcome it simply by changing course and then invoking the doctrine." *Pro Publica, Inc. v. Bligh*, 804 F. Supp. 3d 1082, 1089 (S.D. Cal. 2025).

At the hearing, Plaintiffs argued that the controversy remains live because Commissioner Gallus's Declaration is not prospective; it offers no assurances regarding Plaintiffs' future speech. Plaintiffs maintain that receiving complaints and being mandated to undertake the preliminary steps of responding constitute a

sufficient injury that chills speech, and there is no indication that this harm will not recur.

In response, Defendants focused on whether an injury has occurred at all, arguing that the statue has never been formally enforced against Plaintiffs. Defendants characterized the complaint process as a routine, non-adversarial administrative procedure, noting that the Commissioner frequently receives complaints and requests responses from alleged violators.

The Court concludes that the controversy remains live. Defendants have ceased only a specific mechanism of enforcement (the current administrative complaints) while refusing to abandon enforcement of the underlying Act. Because Defendants openly intend to continue applying the Act, the core constitutional dispute is fully active. While an injunction targeting the current complaints may no longer be necessary, the Court retains the power to issue declaratory and injunctive relief addressing the constitutionality of the underlying Act and preventing the chill of Plaintiffs' speech in the future. This overarching relief would protect Plaintiffs from future administrative burdens and subsequent prosecutions, so an effective remedy exists. Plaintiffs retain a legally cognizable interest in the outcome of this lawsuit, and the action is not moot.

Defendants' arguments fail to meet the heavy burden of showing that the challenged conduct cannot reasonably be expected to recur. As explained above,

Defendants have not disavowed enforcement of the Act. To the contrary, they maintain that the Act will continue to be enforced against Plaintiffs and others. Defendants acknowledge that if third parties file complaints against Plaintiffs for similar future mailers, Plaintiffs will still be forced to respond to the administrative inquiry. Courts routinely reject attempts by defendants to isolate individual enforcement proceedings to achieve a state of "unilateral mootness" while preserving the overarching regulatory threat. *See, e.g.*, *Eichwedel v. Curry*, 700 F.3d 275, 280 (7th Cir. 2012).

Furthermore, without clear statutory definitions for terms like "satire" and "parody," Plaintiffs hold an objectively reasonable fear of future enforcement. They remain at the whim of Defendants, who retain unchecked authority to apply arbitrary definitions and regulate Plaintiffs' political speech—a dynamic at odds with the First Amendment. Because an administrative procedure capable of culminating in prosecution is sufficient to chill speech, the injury to Plaintiffs is ongoing.

Finally, two practical realities underscore why the Declaration cannot moot this case. First, while Commissioner Gallus pledged that his office would dismiss the pending complaints as time allows, Defendants have provided no evidence that these complaints have actually been dismissed. Second, the Declaration fails to bind co-Defendants Downs and Knudsen, nor does it address the private right of action under the Act. A disavowal of enforcement that does not speak for all relevant

government actors is legally inadequate to moot a controversy. *See Isaacson v. Mayes*, 84 F.4th 1089, 1100 (9th Cir. 2023).

Because Defendants plan to enforce the Act pursuant to future complaints, they have failed to prove that the injury "cannot reasonably be expected to recur." *See Friends of the Earth*, 528 U.S. at 190. Accordingly, the ongoing threat of enforcement continues to chill Plaintiffs' speech, and the controversy is not moot.

### *C. Preliminary Injunction Factors*

Plaintiffs are likely to succeed in showing that the Act imposes an unlawful content- and viewpoint-based restriction.[1] Because this ongoing constitutional violation inflicts irreparable harm, and the balance of equities and public interest both favor protecting constitutional rights, the remainder of the *Winter* factors weigh in Plaintiffs' favor.

#### *1. Likelihood of Success on the Merits*

To determine whether a First Amendment plaintiff can demonstrate a likelihood of success, the Ninth Circuit applies a burden-shifting framework. Under this approach, "the moving party bears the initial burden of making a colorable claim that its First Amendment rights have been infringed, or are threatened with

[1] Because the Court ultimately finds that Plaintiffs have demonstrated a likelihood of success on the merits of their First Amendment content- and viewpoint-based discrimination claims, it need not address Plaintiffs' additional arguments regarding Fourteenth Amendment vagueness at this time.

infringement, at which point the burden shifts to the government to justify the restriction." *Thalheimer v. City of San Diego*, 645 F.3d 1109, 1116 (9th Cir. 2011), *overruled in part on other grounds by*, *Bd. of Trs. of Glazing Health & Welfare Tr. v. Chambers*, 941 F.3d 1195 (9th Cir. 2019).

"The First Amendment, applicable to the [s]tates through the Fourteenth Amendment, prohibits laws that abridge the freedom of speech." *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 766 (2018). Pursuant to this protection, the government cannot "restrict expression because of its message, its ideas, its subject matter, or its content." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015) (citing *Police Dep't of Chi. v. Mosley*, 408 U.S. 92, 95 (1972)). These protections are especially demanding where a law targets political speech, which "occupies the highest rung of the hierarchy of First Amendment values." *Butcher v. Knudsen*, 38 F.4th 1163, 1169 (9th Cir. 2022) (quoting *Snyder v. Phelps*, 562 U.S. 443, 452 (2011)). Courts evaluate these First Amendment protections by first analyzing whether the challenged law constitutes a content- or viewpoint-based restriction.

A law is content-based if it "target[s] speech based on its communicative content" by restricting discussion of a specific subject matter or topic. *Reed*, 576 U.S. at 163. In practice, if enforcement authorities must "examine the content of the message that is conveyed to determine whether a violation has occurred," the law is

facially content-based and presumptively unconstitutional. *Id.*; *McCullen v. Coakley*, 573 U.S. 464, 479 (2014) (citation modified).

Facially content-based laws trigger "strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of 'animus toward the ideas contained' in the regulated speech." *Reed*, 576 U.S. at 165 (citing *Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 429 (1993)). Strict scrutiny requires the government to prove that its regulation is narrowly tailored to serve a compelling interest. *Nat'l Inst.*, 585 U.S. at 766. This standard is demanding: "[t]he [s]tate must specifically identify an actual problem in need of solving, and the curtailment of free speech must be actually necessary to the solution." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 799 (2011) (citation modified). Consequently, "[i]t is rare that a regulation restricting speech because of its content will ever be permissible." *Id.* (citing *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 818 (2000)).

Viewpoint-based discrimination is an even "more blatant," "egregious form of content discrimination," occurring when the government targets the "particular views taken by speakers on a subject." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). Suppressing a speaker's "specific motivating ideology" or perspective is impermissible because it threatens to "drive certain ideas

or viewpoints from the marketplace." *Id.*; *R.A.V. v. City of St. Paul*, 505 U.S. 377, 387 (1992) (citation omitted).

Controlling precedents diverge on whether viewpoint discrimination is unconstitutional per se or must face strict scrutiny. *Compare Iancu v. Brunetti*, 588 U.S. 388, 393 (2019) ("[I]f a trademark registration bar is viewpoint-based, it is unconstitutional."), *and Pleasant Grove City v. Summum*, 555 U.S. 460, 469 (2009) (Content-based restrictions "must satisfy strict scrutiny," but "restrictions based on viewpoint are prohibited."), *with Bates v. Pakseresht*, 146 F.4th 772, 784 (9th Cir. 2025) ("A law that suppresses or compels speech based either on content or viewpoint is subject to strict scrutiny.").

Nevertheless, strict scrutiny remains the minimum threshold the Act must clear under either line of authority. Accordingly, the Court first concludes that the Act is both content- and viewpoint-discriminatory, and then applies strict scrutiny.

*a. Content- and Viewpoint-Based Discrimination*

Plaintiffs contend the Act is content-discriminatory "because it 'requires enforcement authorities to examine the content of the message that is conveyed'—specifically whether it is a 'deepfake' of a candidate or political party—'to determine whether a violation has occurred.'" (Doc. 7 at 18 (citing *Garcia v. County of Alameda*, 150 F.4th 1224, 1232 (9th Cir. 2025)). Although Defendants' brief failed

to address this issue (*see* Doc. 14), Defendants conceded during oral argument that the Act discriminates based on content.

The Court agrees with both parties that the Act is, at minimum, a content-based restriction. Enforcement authorities must scrutinize the substance of the image, audio, or video to determine if it depicts a deepfake of a candidate or political party. By targeting and regulating a narrow, specific category of speech, the Act is content-discriminatory on its face. *See* Mont. Code Ann. § 13-35-801. Plaintiffs are therefore likely to succeed in establishing that the Act constitutes content-based discrimination.

Next, Plaintiffs argue that the Act targets specific viewpoints because it "permits positive deepfakes intended to bolster a candidate's reputation . . . but prohibits derogative political content intended to harm a candidate's reputation." (Doc. 7 at 18–19). Defendants did not address this issue in their briefing but resisted the viewpoint-discrimination label at oral argument.

The alleged constitutional infirmity lies in the Act's definition of a deepfake. The Act limits liability exclusively to AI-generated or synthetic media "that depicts a candidate or political party with the intent to injure the reputation of a candidate or party or otherwise deceive a voter." Mont. Code Ann. § 13-35-801(3). At the hearing, Plaintiffs emphasized that because the Act triggers liability based on whether the speaker intends to injure a reputation, it targets "particular views taken

by speakers on a subject"—suppressing criticism while leaving praise unchecked. *See Rosenberger*, 515 U.S. at 829.

Defendants did not dispute that this segment of the Act distinguishes between denigrating and laudatory remarks. Instead, they pointed to the secondary catchall phrase—"or otherwise deceive a voter"—arguing that this clause allows the Act to sweep in deceptive content regardless of whether it is critical or complimentary. Plaintiffs countered that this trailing clause cannot salvage the facial viewpoint discrimination embedded in the first part of the definition.

The Court agrees with Plaintiffs. Under the first part of the definition, the Act exposes speakers to penalties only when their content is injurious rather than uplifting. This statutory framework mirrors viewpoint-based restrictions previously invalidated by the Supreme Court.

In *Matal v. Tam*, the Supreme Court held that a clause prohibiting registration of trademarks that might "disparage" persons was facially unconstitutional, rejecting the government's defense that "the law [was] viewpoint neutral because it applie[d] in equal measure to any trademark that demeans or offends." 582 U.S. 218, 249 (2017) (Kennedy, J., concurring in part and concurring in the judgment). As Justice Kennedy explained, "[t]o prohibit all sides from criticizing their opponents makes a law more viewpoint based, not less so." *Id.* He compared the ban at issue to a law providing that "public officials could be praised and not condemned." *Id.* The

Supreme Court reaffirmed this principle in *Iancu*, striking down a similar ban on "immoral" or "scandalous" trademarks because it drove certain perspectives from the marketplace. 588 U.S. at 393.

The Court further agrees with Plaintiffs that the catchall phrase at the end of the deepfake definition does not alter its viewpoint-discriminatory design. The inclusion of a viewpoint-neutral deception category does not erase or override the explicitly viewpoint-based prong that precedes it. A speaker who disseminates a highly flattering, laudatory deepfake with no intent to injure a candidate's reputation escapes liability under the first prong entirely. Conversely, a speaker who publishes a critical or derogatory deepfake with the same level of synthetic alteration is immediately exposed to penalties under the reputation-injury prong.

The government cannot immunize a targeted, viewpoint-based speech restriction simply by embedding it alongside a broader, more neutral prohibition. Even if the catchall phrase captures some general deception across various media formats, the statutory framework still draws an impermissible line between derogatory and laudatory political expression.

Accordingly, because the Act treats identically deceptive media differently based solely on whether its message is weaponized to damage or deployed to elevate a candidate, the Court finds that Plaintiffs are likely to succeed in establishing that the Act constitutes viewpoint-based discrimination.

*b. Strict Scrutiny*

Having determined that the Act is presumptively unconstitutional because it facially discriminates based on content and viewpoint, the Court proceeds to a strict scrutiny analysis. *See Reed*, 576 U.S. at 163–64. Plaintiffs concede—and the Court agrees—that Defendants have stated a compelling government interest in protecting the integrity and reliability of the electoral process through free and fair elections. (*See* Doc. 7 at 21; Doc. 16 at 9; Doc. 14 at 18–19); *see also Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (quoting *Eu v. S.F. Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 231 (1989)) ("A [s]tate indisputably has a compelling interest in preserving the integrity of its election process."). However, the parties dispute whether the Act satisfies the narrow tailoring requirement.

Narrow tailoring requires any "curtailment of free speech . . . [to] be actually necessary." *Brown*, 564 U.S. at 799. "If a less restrictive alternative would serve the [g]overnment's purpose," the speech restriction is overinclusive, and "the legislature must use [the] alternative." *Playboy Ent. Grp.*, 529 U.S. at 813; *Valle Del Sol Inc. v. Whiting*, 709 F.3d 808, 826 (9th Cir. 2013). To sustain its chosen restriction, the government bears the burden to "demonstrate that alternative measures that burden substantially less speech would fail to achieve the government's interests, not simply that the chosen route is easier." *McCullen*, 573 U.S. at 495.

Plaintiffs contend the Act is an overly broad restriction on political speech because the government's curtailment of that speech does not represent the least restrictive means available to protect election integrity. (Doc. 7 at 21). They argue that "[a] state's interest in electoral integrity does not authorize restricting political speech beyond falsehoods about voting procedures that jeopardize individuals' right to vote." (Doc. 16 at 9); *see McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 345 (1995) (distinguishing the regulation of "pure speech" from the regulation of the "mechanics of the electoral process").

To that end, Plaintiffs identify several existing, less-restrictive alternatives that would achieve the government's goals without stifling protected expression. First, Plaintiffs propose counterspeech. As declared by the Supreme Court, "[t]he remedy for speech that is false is speech that is true." (Doc. 7 at 23–24 (citing *United States v. Alvarez*, 567 U.S. 709, 727 (2012))). Second, the government could deploy targeted educational campaigns to enhance digital and electoral literacy. (*Id.* at 23–25). Third, existing tort law—including "privacy torts, copyright infringement, [and] defamation"—provides legal remedies for "truly egregious fakes that actually inflict reputational harm." (*Id.* at 25). Fourth, Montana law criminalizes conduct aimed at interfering with a voter's franchise, penalizing "using force, coercion, violence, restraint, undue influence[,] or threats to interfere with another voter's exercise of the franchise." (*Id.* (citing Mont. Code Ann. § 13-25-318)).

Defendants do not discredit, address, or otherwise attempt to explain why these less restrictive alternatives are insufficient to protect the government's designated interests. Because Defendants failed to show that any of these alternative methods would be ineffective, the Court "affords minimal deference to [the government's] choice to stifle speech at the outset rather than use less restrictive" alternatives. *See Kohls v. Bonta*, 797 F. Supp. 3d 1177, 1187 (E.D. Cal. 2025). Accordingly, the Court joins other district courts in this circuit that have addressed similar statutes in recognizing the wide variety of less restrictive alternatives available to the government—including tort law, criminal liability for election interference, educational campaigns, and counterspeech. *See id.* at 1186–87; *Babylon Bee, LLC v. Lopez*, 818 F. Supp. 3d 1181, 1203–05 (D. Haw. 2026). As in those cases, Defendants here have failed to prove that the purported risks of generative AI technologies could not be adequately managed through these less intrusive measures.

While Defendants do not address whether less restrictive, speech-neutral alternatives exist, they claim that the Disclosure saves the Act from being unduly restrictive. Specifically, Defendants compare the Act's Disclosure to the disclaimer upheld in *Citizens United v. FEC*, 558 U.S. 310 (2010), which the Supreme Court found provided critical information to the electorate and "insure[d] that the voters are fully informed." (Doc. 14 at 23 (citing *Citizens United*, 558 U.S. at 368)).

According to Defendants, the Disclosure has a "substantial relationship to Montana's compelling interest in preserving election integrity." (*Id.* at 24 (citing *Citizens United*, 558 U.S. at 366)).

Plaintiffs counter that the Disclosure's requirements are fundamentally distinct from those in *Citizens United*. As Plaintiffs note, "[r]equiring identification of the speaker or sponsor of an advertisement serves an anti-corruption rationale by allowing observers 'to follow the money.'" (Doc. 16 at 11 (citing *Hum. Life of Wash. Inc. v. Brumsickle*, 624 F.3d 990, 997 (9th Cir. 2010)). Here, by contrast, "the Act would compel commentary on the content itself, thus altering, and for Bartel's speech, undermining, the original message." (*Id.*).

The Court agrees with Plaintiffs' distinction. "Directly regulating what is said or distributed during an election . . . goes beyond an attempt to control the process to enhance the fairness overall so as to carefully protect the right to vote." *281 Care Comm. v. Arneson*, 766 F.3d 774, 787 (8th Cir. 2014). "[W]hen these preservation goals" to protect election integrity "are achieved at the expense of public discourse, they become problematic." *Id.* at 786.

Unlike standard donor or sponsor disclaimers, the Act's Disclosure forces creators to "speak a particular message" that they would otherwise omit, thereby "alter[ing] the content of the speech." *See Nat'l Inst.*, 585 U.S. at 766; *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 795 (1988). For example, if Plaintiffs

used a disclaimer on their mailers regarding Representatives Carlson and Albus, they would be forced to publish content they believe to be an accurate representation of the representatives' voting records, while simultaneously appending a government-mandated label stating the content is unauthentic or untruthful. This dynamic functions as an outright alteration of the speech itself rather than a neutral regulation of the electoral process. While the disclaimer in *Citizens United* merely informed voters who paid for the advertisement, it did not require a speaker to declare their own content inaccurate or untruthful. As the *Kohls* court similarly recognized, the Act's Disclosure poses a severe risk of "drown[ing] out" the very message the speaker intends to convey. 797 F. Supp. 3d at 1189. Accordingly, the Disclosure does not save the Act.

Lacking narrow tailoring, the Act fails strict scrutiny. *Imperial Sovereign Ct.*, 170 F.4th at 845 ("[I]f a court concludes that a content-based speech restriction fails strict scrutiny, the analysis ends. The law is facially invalid and cannot be enforced against anyone."). Plaintiffs have therefore demonstrated a likelihood of success on the merits of their First Amendment facial challenge.

*2. Remaining* Winter *Factors*

After demonstrating a likelihood of success on the merits of its claim, a moving party must establish that it is "likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an

injunction is in the public interest." *Winter*, 555 U.S. at 20. When the government is the party opposing the injunction, the equity and public interest factors merge. *Nken v. Holder*, 556 U.S. 418, 436 (2009).

However, when "a party has established likelihood of success on the merits of a constitutional claim—particularly one involving a fundamental right—the remaining *Winter* factors favor enjoining the likely unconstitutional law." *Junior Sports Mags. Inc. v. Bonta*, 80 F.4th 1109, 1120 (9th Cir. 2023). Accordingly, because Plaintiffs have raised "a colorable First Amendment claim, they have demonstrated that they will likely suffer irreparable harm if the [Act] takes effect." *Am. Beverage Ass'n v. City & County of San Francisco*, 916 F.3d 749, 758 (9th Cir. 2019) (en banc). Furthermore, Plaintiffs "have raised serious First Amendment questions . . . [so] the balance of hardships tips sharply in [their] favor." *Id.* (citation modified). Finally, "it is always in the public interest to prevent the violation of a party's constitutional rights." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (citation omitted).

In sum, Plaintiffs have demonstrated a likelihood of success on the merits of their First Amendment challenge, and they have satisfied the remaining *Winter* factors.

///

///

*D. Scope of Relief*

Because injunctive relief is appropriate, the Court now considers the proper scope of the injunction. Plaintiffs' Motion seeks "an order preliminarily enjoining Defendants . . . from reviewing, investigating, prosecuting, adjudicating, or enforcing [any] violations of [the Act]" globally, rather than limiting relief to the named parties. (*See* Doc. 6 at 2).

At the close of the hearing, Defendants requested that any preliminary injunction be no more burdensome than necessary, contending that enforcement should be blocked only as to the named Plaintiffs. In support, Defendants cited *Trump v. CASA, Inc.*, 606 U.S. 831 (2025), for the proposition that broad injunctions prohibiting the overall enforcement of a law likely exceed a federal court's equitable authority. Because Plaintiffs bear the burden of proving that a sweeping injunction is necessary to remedy their specific injuries—a showing Defendants argue was not made—Defendants maintain that the remedy must be strictly limited to the named parties.

Plaintiffs countered that a total bar on enforcing the Act is proper. They attempted to distinguish *CASA*, noting that it neither involved First Amendment claims nor addressed declaratory relief. Furthermore, Plaintiffs argued that *CASA* addressed nationwide injunctions of federal enforcement actions rather than state

statutory schemes. Accordingly, Plaintiffs contended that broad, universal relief is both appropriate and permitted under *CASA*.

In *CASA*, 606 U.S. at 837, the Supreme Court restricted the authority of district courts to issue "universal" injunctions—those that "prohibit enforcement of a law or policy against *anyone*," rather than just named plaintiffs. Ultimately, the Supreme Court concluded that such sweeping injunctions "likely exceed the equitable authority that Congress has granted to federal courts." *Id.*

In reaching its conclusion, the Supreme Court examined the history of injunctive relief and the traditionally limited scope envisioned by the Judiciary Act of 1789. *Id.* at 841–42. While the Judiciary Act authorized district courts to hear suits in equity, "the statutory grant encompasses only those sorts of equitable remedies 'traditionally accorded by courts of equity' at our country's inception." *Id.* at 841 (quoting *Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 319 (1999)). Upon examining the relief available in English and American courts of equity during the founding era, the Supreme Court concluded that "[n]either the universal injunction nor any analogous form of relief was available." *Id.* at 842–43. Consequently, the Supreme Court held that the universal injunction lacks the necessary "historical pedigree" and thus "falls outside the bounds of a federal court's equitable authority under the Judiciary Act." *Id.* at 847.

Despite limiting "universal relief," *CASA* reaffirmed that district courts retain the authority to "administer complete relief *between the parties*." *Id.* at 851. The Supreme Court reiterated that "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief *to the plaintiffs*." *Id.* at 852 (citation modified). Accordingly, the Supreme Court stayed the preliminary injunctions at issue "only to the extent that [they were] broader than necessary to provide complete relief to each plaintiff with standing to sue." *Id.* at 861.

Although the Ninth Circuit has not addressed a case identical to the present one, following *CASA*, it has similarly constrained the scope of lower court remedies. For example, in *Dickinson v. Trump*, 174 F.4th 634, 646 (9th Cir. 2026), the court invalidated a preliminary injunction as overbroad because it "improperly extend[ed] not merely to the five plaintiffs but to anyone in the world who wishes to protest at the Portland ICE facility."

The Court is unpersuaded that *CASA* carves out any exception permitting a universal injunction in this case, and therefore limits the scope of relief to the named parties. First, the fact that this case involves state laws and a potential statewide injunction does not remove it from *CASA*'s structural limitations. As the Supreme Court noted, the "difference between a traditional injunction and a universal injunction is not so much *where* it applies, but *whom* it protects: A universal injunction prohibits the [g]overnment from enforcing the law against *anyone*,

anywhere." *CASA*, 606 U.S. at 837 n.1. The Supreme Court's historical analysis of equitable power did not exempt state laws; while *CASA* narrowed a district court's power to bar enforcement against nonparties, nothing in the opinion suggests different rules apply to state laws rather than federal actions. To the contrary, the Supreme Court favorably cited precedent limiting the scope of relief when enjoining state laws.

For instance, the Supreme Court highlighted *Scott v. Donald*, 165 U.S. 107, 109 (1897), where a plaintiff successfully challenged the constitutionality of a state law used by state officials to confiscate personal property. *CASA*, 606 U.S. at 843. "Although the plaintiff there sought an injunction barring enforcement of the law against both himself and anyone else 'whose rights [were] infringed and threatened' by it," the Supreme Court permitted only a narrow decree limited to "the parties named as plaintiff and defendants in the bill." *Id.* (quoting *Scott*, 165 U.S. at 115–17). In citing this state-law challenge, the Supreme Court drew no distinction based on the involvement of a state statute.

The Supreme Court's reliance on *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 931 (1975), further confirms that relief here must be limited to Plaintiffs. Despite the lack of federal action in *Doran*, the Supreme Court restricted the injunction of an overbroad municipal ordinance "to the particular federal plaintiffs." *CASA*, 606 U.S. at 844. As the Supreme Court concluded, "[n]either declaratory nor injunctive relief

. . . can directly interfere with enforcement of contested statutes or ordinances except with respect to the particular federal plaintiffs." *Id.* (citation modified). Thus, while district courts in other circuits have attempted to carve out exceptions for statewide injunctions, *see, e.g.*, *Welty v. Dunaway*, 791 F. Supp. 3d 818, 842–43 (M.D. Tenn. 2025), *CASA* supports no such distinction. Regardless of the type of law being challenged, a district court must tailor its injunction to provide complete relief to the named plaintiffs—and nothing more.

Moreover, the Court finds no basis to distinguish *CASA* simply because this case involves a First Amendment overbreadth challenge. In *HM Florida-ORL, LLC v. Governor of Florida*, the Eleventh Circuit rejected a similar argument that a universal injunction is permissible to remedy a facial overbreadth claim. No. 23-12160, 2026 WL 2235960, at *4 (11th Cir. Aug. 4, 2026). The court disagreed, emphasizing that "[t]he reasoning in *CASA* had nothing to do with a plaintiff's cause of action. Rather, it concerned the remedies authorized under the Judiciary Act." *Id.* This Court concurs that nothing in *CASA*'s extensive historical analysis carves out an exception for First Amendment overbreadth challenges.

Finally, Plaintiffs' argument that the presence of a claim for declaratory relief distinguishes this case from *CASA* falls flat. The plaintiffs in *CASA* also requested declaratory relief. Crucially, *CASA* reached the Supreme Court at the preliminary injunction stage—before final relief on the merits had been addressed—which is

exactly the posture here. Because the requested relief at this stage is a preliminary injunction, *CASA* strictly limits this Court's authority to expand the scope of injunctive relief to nonparties.

Ultimately, this Court cannot conclude that providing complete relief to the named Plaintiffs requires an injunction restricting enforcement of the Act against nonparties. The Court therefore lacks the authority under the Judiciary Act of 1789 to issue a universal injunction prohibiting enforcement globally against anyone impacted by the Act. To comply with the mandate that equitable relief be no more burdensome than necessary, relief must be limited to the named Plaintiffs.

While the potential universe of individuals affected by Montana state laws extends to anyone under the state's jurisdiction, prohibiting enforcement of the Act against these specific Plaintiffs provides them with whole and absolute relief: their political speech will no longer be chilled by the threat of enforcement. "Extending the injunction to cover all other similarly situated individuals would not render [Plaintiffs'] relief any more complete." *CASA*, 606 U.S. at 853. Accordingly, the Court limits the preliminary injunction to preventing enforcement against the named Plaintiffs.

## IV. Conclusion

For the reasons stated herein, IT IS HEREBY ORDERED that Plaintiffs Accountability in State Government and Dan Bartel's Motion for a Preliminary

Injunction (Doc. 6) is GRANTED. Defendants Austin Knudsen, Kevin Downs, and Chris Gallus, Montana Commissioner of Political Practices, are HEREBY ENJOINED from reviewing, investigating, prosecuting, adjudicating, or enforcing the Act against the named Plaintiffs.

DATED this 16th day of September, 2026.

Susan P. Watters

SUSAN P. WATTERS
United States District Judge